MISSISSIPPI POWER & LIGHT CO. *v.* THOMAS.

In Banc. April 11, 1949.

(39 So. (2d) 759; 40 So. (2d) 597)

202

Henry & Barbour, Green & Green, and A. M. Nelson, for appellant.

**J. G. Holmes,** for appellee.

**Alexander, J.**

Appellee brought an action for personal injuries suffered when gas escaping from a pipe-line, laid by appellant, ignited from a spark from her automobile while being started in her garage. The declaration counted, upon two elements of negligence, an improper installation of the pipe and the use of an improper union or pipe connection. From a verdict and judgment in the sum of $3,000, the defendant appeals.

The gas line was laid in 1944, and consisted of several joints approximately twenty feet in length. It was laid between fifteen and eighteen inches underground. The joints were united by what is described as a ''Dresser Coupling.'' One of these couplings pulled apart at a place beneath the garage. This dislocation was both horizontal and vertical, one end of the pipe being some three inches below the opposite end, and the separation being about three inches. The coupling remained attached to the southernmost joint. The garage was erected in the latter part of 1947, and the explosion occurred thirty-eight days thereafter. The garage was erected upon ground which sloped southward to the rear of the garage, and rested upon a solid foundation wall about the sides and rear. These walls were laid upon the surface of the ground, and were six inches thick, and their height varied from six feet at the rear to about two and a half feet at the front. The floor of the garage was constructed by filling inside this foundation wall with dirt to the level of a driveway leading to the street. The floor was finished with three concrete runners so as to accommodate two cars. The weight of the entire garage was estimated at

eighty thousand pounds. The broken joint was beneath the dirt fill toward the front part of the fill.

Appellant's concern rises above the usual interest in displacing an adverse verdict, and seems to involve an anxiety that an affirmance of the judgment would impliedly, if not directly, proscribe the use of the "Dresser Coupling," which, he asserts, with testimonial support, has been widely used by this and other gas companies in uniting pipe sections. While we would not be privileged to share this concern as a troubling incident to a conclusion if compelled thereto by a legal necessity, we take occasion to state that neither the verdict nor our conclusions need carry such implication.

This coupling, described without technical nicety, consists of a metal sleeve or coupling body about six inches long, into which the opposing ends of pipe joints are slipped, and which is tightened by octagonal threaded nuts at each end. This action engages and progressively tightens about the pipe a rubber compound gasket, thereby sealing the line against leakage, and by pressure or compression makes a tight, though flexible, joint. Tensile strength is sought to be assured by friction produced through the tightening of the end nuts, which causes a gasket retainer to engage and hold the gaskets fast about the pipe ends. Its merit over other union devices is argued upon the ground of its flexibility which allows the pipe to slip under great pressure rather than allow a break of the pipe at the joint or at a terminal connection. To emphasize this quality of flexibility, a concession is made that it is possible for such joints to pull apart, although when properly installed they afford a tensile strength of about one thousand pounds. Its technical and popular designation as a "slip joint" conveys more than a mere implication that, if improperly applied, it would constitute a hazard not only of leakage but of actual separation.

There was conflicting testimony regarding the comparative strength and safety of other methods of coupl-

ing, notably by welding or the use of "ground joints" or screw couplings. Yet, the defendant procured instructions which effectively excluded comparisons with other such devices provided the Dresser Coupling was found to be reasonably safe. Taking into account their widespread use and general approval was therein authorized.

It is clear that the issue of liability involves the questions whether (1) the coupling used was under the circumstances reasonably safe; (2) whether it was properly installed; (3) whether the erection of the garage was the sole proximate cause of the break; and (4) whether the erection of the garage was a reasonably foreseeable contingency against which the defendant was required to guard, or for which it was bound to make allowance. Of course, negligence in erecting the garage in the manner, and at the location, even though a concurring cause, would not of itself absolve the defendant unless it was the sole intervening cause. These alternatives were presented to the jury through proper instructions. Arguments to support the respective contentions include the observation that a leak in the pipe would not have been a serious hazard had the garage not been erected over the joint, thereby allowing the escaping gas to be accumulated and confined; that a water line of similar dimensions was laid parallel to the gas line and beneath the garage. The water line was joined with a screw coupling, and, though exposed to the same conditions, did not break or pull apart. The "Dresser Coupling" was constructed so as to remain tight against leakage, yet under emergency conditions it allowed a play or expansion by slippage equal to twice the extent to which each pipe end was inserted beyond the gasket. Just what amount of sway or deflection in the line would extend its length to the point of separation is not computed, yet the diagrams exhibited did not show any substantial sag of the line, but only, as stated above, a vertical displacement of the southern or rear section of pipe below the north or front section.

It is noteworthy that the other joints were sufficiently secure to withstand the pressure or strain, however imposed, and that the other end of the coupling here involved remained intact. The connecting pipe joints were not similarly depressed but only the south or rear joint, which retained the coupling, was found to be three inches below the opposing joint. This supports a view that the dislocation was not due to vertical pressure from weight above the joint, but by a horizontal pull which tested its tensile strength. The more plausible theory of the defendant is that such lateral strain resulted from the weight of the rear wall and the adjacent fill, which, exerted at a point beneath the real wall, caused the southern joint to sway in an arc sufficient to cause a shortening of its length beyond the safe margin of about three inches. As stated, the diagrams exhibited do not, however, show any such deflection. The break occurred about seven feet from the front end of the garage, which, as stated, was about two and a half feet above ground, and about twelve feet from the rear wall which was about six feet high. The floor of the garage was between three and four feet above the joint.

Further elaboration of statistical data would not be helpful. The issues sharply presented are: (1) Was the erection of the garage at the place, and in the manner indicated, a reasonably foreseeable probability? If so, (2) was the pipe-line laid with commensurate care in view of such probability? (3) If such erection was not reasonably foreseeable, was it the sole and intervening cause of the break and resulting injury?

Had there been no garage, the pulling apart of the joints would have presented a simple case, although one of the defendant's instructions denied the application of the res ipsa loquiter doctrine.

Now, certain factors are without dispute. The pipe-line did pull apart, gas did escape, and as a result thereof, plaintiff was injured. Was the erection of the garage the sole, proximate cause of the injury? This would have

to be true to justify the exoneration of defendant. Yet, there must be more. Its erection must have been a contingency which the defendant was not chargeable with anticipating as a reasonable probability.

This suit involves no contributory negligence by the plaintiff. If both the defendant and he who erected the garage were guilty of negligence proximately contributing to the injury, she may recover from either regardless of the extent of their respective contributions. If precedent negligence of defendant was activated or augmented by the act of another to the point of actual injury, the defendant would be yet answerable for its fault.

The issues of reasonable foreseeability and of sole, intervening cause were fully submitted by instructions to the jury. Also presented were the issues whether the joint used was proper under the particular circumstances, and whether, even if proper, it was properly or negligently installed. The jury were left free to resolve these issues, and to fix the blame on whomsoever it chose, or to attribute it to mere accident. We are of the opinion that these issues were factual and properly submitted.

The suit was not grounded upon an alleged violation of a municipal ordinance which provided, in such cases, that "no unions except ground joint or metallic seat unions are allowed." Yet, it is assigned for error that the plaintiff was allowed to introduce in evidence the ordinance of the municipality. We do not digress to follow an assault upon the constitutionality of the ordinance, for the reasons hereafter stated. Attack is directed particularly to the testimony which more than implied that the defendant, by installing "Dresser Couplings" throughout the city, had incurred criminal responsibility. The possibility of adverse prejudice thereby has caused us no little concern.

Regardless of the evidential value and propriety of thus proving negligence (as to which see 38 Am.Jur., Negligence, Sec. 168), we do not here justify it on such ground. The fact of such ordinance was first established

by the defendant, although its provisions were not exhibited. Moreover, the defendant procured instructions to the effect that it was not the defendant's duty to furnish any particular kind of coupling, and left for decision only the issue whether there was used a coupling "such as is recognized by the trade and by custom and usage to be reasonably safe and proper under the circumstances, and if you believe that the Dresser Coupling was reasonably safe when properly installed, and recognized as standard and proper, then you should find for the defendant regardless of every other fact and circumstance in the case."

In nullifying the implication of the ordinance, the defendant procured instructions to the effect that if the coupling used was of a type approved and used by the industry, and recognized as being reasonably safe and was properly installed, they would deny recovery. Such instructions authorized a finding that the defendant had used due care in the use of Dresser Couplings; or that such coupling was improperly and negligently installed; or, that the sole cause of the injury was the superseding negligence of the builder of the garage.

To insure against a condemnation by the jury of the Dresser Coupling, per se, the defendant procured instructions that if such coupling was generally accepted and used (and there was ample testimony thereto) and was itself reasonably safe, there could be no recovery "even though you may believe that a welded joint or rigid screw joint would not have broken, or would have broken at some other point, without injuring the plaintiff."

It is evident, therefore, that the controlling issue was that of a proper installation in view of existing and reasonably foreseeable conditions. The assertion that the pipe-line had been laid for two and a half years, and the injury occurred thirty-eight days after erection of the garage, supplied material for argument which has been plausibly utilized. Yet, the jury had before it testimony that gas escaping into the open air is usally harmless. But, that its concentration within the founda-

tion walls would make it a patent hazard. In this connection, defendant, in concluding that the erection of the building was the sole cause of the injury, assumes as one premise that there may have been a prior disconnection, which, however, negligently caused, would not have culminated in any injury if the garage had not been built. In other words, there would arise a situation explicable in a coined phrase "injuria absque damno." Of course, defendant concedes no prior break as a fact, but stands upon the theory of damnum absque injuria. The jury were free, therefore, to consider whether the garage caused the break, or merely magnified its effects. It may bear repetition that the refendant may escape liability only upon an intial finding that the garage, as and where constructed, was the sole proximate cause of the injury. But, for the garage, resourcefulness of the defendant would be put to severe test to defend against such breakage and a resultant injury.

In some, but not all, of plaintiff's instructions, the jury were told that the defendant was charged with "the highest degree of care commensurate with the dangers of gas leaking or escaping from any coupling . . ." The writer of this opinion, who does not in this respect speak for the Court, is of the opinion that there are no "degrees" of care, but that requisite care is comprehensively defined as that degree of care commensurate with appreciable danger, appraised in terms of ordinary prudence, and interpreted in the light of the attendant circumstances. Roberts v. Mississippi Power & Light Co., 193 Miss. 627, 10 So(2d)542. Yet, the employment of the phrase "highest degree of care" has been frequently used. State to Use of Johnson v. Cunningham, 107 Miss. 140, 65 So. 115, 51 L.R.A.,N.S., 1179. In its superlative aspect, it implies a responsibility which is violated by only slight negligence. Is its force sufficiently restrained by the qualification that such care be commensurate with the danger? Certainly if it is to be measured by the danger and limited

thereby, the uncertainity which could otherwise blur the outlines of the vague superlative are at once brought into focus by the clarity of the limitation. Other instructions for the plaintiff, and all those for the defendant, fixed the measure of care by the standard of reasonable prudence.

The issue whether the coupling was properly installed was submitted by the circumstances that it pulled apart and direct testimony in this regard was sought to be elicited from defendant's witness Turner who made the installation. He stated: "I put it together as near correct as my knowledge." In response to repeated inquiries whether if it had been properly coupled, it would, under the circumstances, have pulled apart, the witness persisted in the ambiguous answer, "Well, it did pull apart." The jury was therefore faced with an interpretation which, on the one hand, meant that it would pull apart despite due care, which would search the adequacy of the coupling as a proper device; and on the other hand, could infer that the very fact of disconnection bespoke a faulty installation.

 Objection is made to the alleged error of the trial court in admitting the testimony of the plaintiff's witnesses, William and Jenne. Their qualifications as expert witnesses is challenged. Both had special training in installation of gas pipes and fittings, and if they had not been accepted by the trial judge as expert witnesses, at least they gave expert testimony as to facts within their special knowledge. See McKelvey on Evidence, 5th Ed., page 339. Such considerations affect only the weight of their testimony.

 Testimony as to the measure of damages is disturbingly indefinite. No physician was called to appraise the extent or duration of the injuries, nor as to their causal connection with the explosion. The case hovers close to the shadow of Hawkins v. Stringer, Miss., 38 So. (2d )454, yet the extent of plaintiff's suffering and the causal connection between her disabilities and the

negligent act place her beyond, but perilously close to, the pale of the cited case. The amount of the award presents another challenge. We have concluded, however, that there is not in it evidence of passion or prejudice, and that however it may assault our judgment, it does not shock the conscience.

Affirmed.

**McGehee, C. J.** (dissenting).

As stated in the controlling opinion herein, this suit is predicated upon two charges or elements of alleged negligence—an improper installation of the service gas pipe-line, and the use of an improper union or coupling for the safe connection of the pipe-line. I do not think there was sufficient evidence, if any evidence at all, to show that the gas line was improperly installed. The specific charge of the declaration in that regard is that the Power & Light Company had "negligently failed to make secure one of the joints thereof and to provide a proper appliance or coupling for said joint, so as to render the same reasonably secure against the pressure of gas," etc.

A Mr. Turner testified, in substance, that on account of the shortage of skillful workers in 1944, when this underground service gas line was installed across the vacant lot on which the garage was later erected, thirty-eight days before the explosion, more than two and a half years after the pipe installation, he, personally, connected the ends of the lengths of pipe by use of the "Dresser Coupling" at six locations along the pipe-line, and when asked whether or not such coupling would pull loose if properly installed, he replied "that one did." Moreover, I am of the opinion that it is conclusively shown that he did in fact securely install the coupling so as to make it reasonably safe to withstand pressure of gas, since there was no proof whatsoever in the record that he did not do so, or that it came loose during the period of more than two and

a half years prior to the erection of the garage over the coupling joint which became disconnected and caused the explosion.

Mention should be made herein of the fact that on the morning of the explosion, the plaintiff had theretofore driven the automobile out of the garage to go to Mass, returned it to the garage, and later when starting the automobile for the purpose of taking her nephew to the ten o'clock Mass, the explosion occurred. If the pipe under the garage had become disconnected during or prior to the night before the explosion, it would appear that the gas which had accumulated therein during the night would have become ignited on her first trip to the garage for the purpose of using the car to go to the early Mass that morning. And mention should be further made that this was during the winter rains and that the concrete foundation of the garage at the back end thereof, where it was approximately five feet high and where it had been placed on top of the ground as a footing, and approximately eighteen inches above the pipe-line, was found to be sunk to within five inches of the pipe-line after the explosion. I do not think that an explosion from leaking gas under the ground would have had a tendency to lower the foundation, since the pressure of the gas would have been upward.

It is stated in the controlling opinion that "it is noteworthy that the other joints were sufficiently secure to withstand the pressure or strain, however imposed, and that the other end of the coupling here involved remainded intact." I think it is more noteworthy that the weight of this 80,000-pound garage was not over any of the other joints. In fact, service gas pipe-lines are not placed beneath buildings, but are extended into buildings so as to connect with the gas appliances from a meter located outside of and immediately adjacent to such buildings.

I also think that it is extending the doctrine of negligence entirely too far to hold that because the defendant

should have reasonably foreseen that a garage might later be erected over the pipe-line would mean that the power and light company should have also reasonably anticipated that the forces of nature causing soil to slide would combine with the weight of the garage so as to disconnect a coupling underneath the same during heavy rains where the connection had remained intact for more than two and a half years.

It was shown, without dispute, that thousands of other Dresser Couplings were used throughout the City of Yazoo and elsewhere, including those throughout the area of sliding soil and elsewhere in our Capital City and in other parts of the country, and without explosions resulting from the use thereof. Such couplings were shown to be in general use as a reasonably safe appliance or connection by the gas distributing industry. In fact, in Crocker's "Piping Handbook," published by McGraw-Hill Book Co., Inc., New York and London, 1945, 4th Ed., it is stated that such a coupling "is well known under the trade names of Dresser Coupling and Dayton Coupling, and is used extensively for air, gas, oil, water, and other services above or underground. . . ." It seems to be generally recognized by the experts in this industry that flexibility in connections is desirable to prevent the line breaking under extraordinary pressure—a quality not found in an underground welded joint; that where a welded joint is used an unsual pressure of weight or from sliding soil may not break it at the point of connection, but will break elsewhere with the likelihood of causing damage. Most assuredly, one making a pipe-line installation would not be required to anticipate more damage from such a result at one place rather than at another.

In the case of Chester Company v. Wisconsin Power & Light Co., 211 Wis. 158, 247 N. W. 861, the company was held liable because it failed to use a flexible joint or connection. If the present suit was for an injury caused by the breaking of a pipe-line where a welded joint was used, it is to be presumed that we would follow this Wisconsin

case and hold that liability should be predicated upon the failure to do what the defendant in the case at bar did do, in an absence of a decision of our own Court, or the weight of authority from other jurisdictions to the contrary. Thus it was that when this pipe-line was installed the defendant was confronted with a well-reasoned opinion from a Supreme Court holding that the flexible connection should have been used; and since there is no decision cited to the contrary, I do not think we should hold the defendant liable for using such appliances as are in general use in the gas distribution industry.

No contention is made anywhere in the brief on behalf of the appellee that the verdict in this case should be upheld on the ground that this coupling was not made secure by the workman when the same was originally installed, although this charge is contained in the declaration and the workman was interrogated in regard thereto. In other words, the contention urged by the appellee here for the affirmance of the judgement appealed from is based upon the negligent use of the Dresser Coupling as not being a reasonably safe appliance. However, the controlling opinion states that "neither the verdict nor our conclusions need carry such implication," thereby meaning to say that the decision of the controlling opinion in this case is not to be construed as condemning the use of the Dresser Coupling.

With the utmost deference, it seems to me that unless the use of this Dresser Coupling is to be condemned, and which I don't think would be warranted under the proof, the affirmance of the case must necessarily rest upon the alleged failure of the workman "to make secure one of the joints" of the pipe, as alleged in the declaration, and this notwithstanding that the workman made the connection so secure that it held for more than two and a half years after its installation, without showing leakage during that time. We are not permitted to conjecture that it is possible that there may have been a leakage prior to the occasion complained of. The burden was upon the

plaintiff to prove such fact, either directly or circumstantially, if the same is to be relied on to support the contention that the weight of the garage and the forces of nature acting upon the soil did not combine as the sole and efficient, intervening and independent cause to produce the reasonably unforeseeable dislocation of the coupling beneath such garage. The jury should not be permitted to say that a connection joint in a pipe-line which has withstood pressure by gas and the forces of nature for more than two and a half years was not securely fastened in the beginning.

Reliance is placed on the fact that the water pipe-line underneath the garage did not become dislocated. However, this line was a distance of about seven feet from the gas line underneath the garage, and this distance graduated to twenty feet out to the end of the lot at the street, and it was not shown that the concrete wall of the garage had sunk where it crossed the water pipe-line. It was shown that the connections of the water pipe-line were screw joints, the use of which have been discontinued by the United Gas Company, one of the fifty-three subsidiaries of the parent company, and that the use of Dresser Couplings in underground gas pipe-lines has continued to be recognized as standard equipment in general use. And while the failure of the water pipe-line to become dislocated may have afforded the basis of a persuasive argument to the jury, it was an immaterial circumstance *for the reasons above stated* on the issue of whether or not a Dresser Coupling in the gas pipe-line was a reasonably safe appliance.

It is true, as stated in the controlling opinion, that "the pipe-line did pull apart, gas did escape, and as a result thereof, plaintiff was injured"; but the test of liability is whether or not in installing the pipe-line the power and light company exercised the proper care to use a reasonably safe coupling and had properly installed the same in such manner as to protect against a reasonably foreseeable accident which occurred more than two and

a half years after the installation thereof. I do not think the affirmative of this proposition is a debatable issue under the undisputed evidence disclosed by this record, including the facts hereinbefore set forth, and that therefore the directed verdict in favor of the defendant should have been granted as requested.

But if mistaken in the view above stated, I am unable to see how we would be justified in not reversing this case for a new trial on the ground that the verdict is contrary to the great and overwhelming weight of the evidence, and for the further reason that the plaintiff was permitted to greatly prejudice the rights of the defendant before the jury by the introduction of a city ordinance and to contend that the same characterizes as a criminal act the use of a Dresser Coupling in gas pipe installations in Yazoo City. And this was permitted notwithstanding the fact that neither the city council nor its gas line inspectors are shown to have ever objected to the general use of these couplings throughout the city as not being in compliance with such ordinance. Moreover, the plaintiff was permitted in the cross-examination of a witness or witnesses to show that these couplings were being used all over the city, and to demand the question to be answered as to whether or not the witness did not know that the use of such a coupling was a violation of the law. Objection was promptly interposed, but overruled. Witness was then asked, "If it is a violation of law, Mississippi Power & Light Company is violating the law all over Yazoo City." This question was objected to without avail. Another witness for the defendant, the one who installed the pipe-line, was also asked, on cross-examination, if he didn't know when he installed this coupling and some four or five others that it was a violation of law in Yazoo City to use this type of coupling. Objection to this question was overruled, and the witness was then asked, "If it was a violation of law, in this short line of 86 feet, you violated the law five times in the construction of this

line." As a matter of fact, the city had no authority in the proper exercise of its police powers to adopt an ordinance that would condemn the use of couplings recognized to be standard equipment and in general use by the defendant and other gas distributing companies, which were shown to be a reasonably safe appliance, since to prohibit such use would be an unreasonable exercise of power.

Be that as it may, the suit was not predicated upon the alleged violence of a city ordinance, and the same should not have been introduced in evidence, nor should the plaintiff have been permitted to characterize the acts of the defendant and its employees as criminal when the inevitable effect of doing so would prejudice a jury against the defendant as having no regard for the ordinance adopted by the constituted authorities of the municipality.

The controlling opinion states, and I think with deference it erroneously states, that "the fact of such ordinance was first established by the defendant, although its provisions were not exhibited." The questions which had been asked by the defendant's counsel were with reference to the regulations of the code as to laying pipes "under the houses and up through the floors and walls of the houses and to the space heaters," etc., when he was examining a witness, who testified that he did not put in underground pipes, but only house pipes. He was then asked: "Q. You have a certain specified code as to what should be done? A. That is right. Q. And those pipes are above the ground? A. That is right." In other words, these questions by the defendant's counsel did not justify the introduction of the ordinance complained of or the highly prejudicial cross-examination of the defendant's witnesses in regard to their alleged repeated violations of the law. And it is inconceivable to me how any occurrence or circumstance that may be developed during a trial where a young lady has been burned or injured, through no fault of her own, could have been more

prejudicial to the rights of the defendant before the jury, even though the court did instruct the jury that the defendant was not required to use any particular type of coupling but was only required to use a reasonably safe one.

In fact, the court correctly instructed the jury as to the law in the instructions granted to the defendant, but these instructions were not followed, and evidently due to the fact that the jury was led into believing from the city ordinance and the characterization of the acts of the defendant as criminal violations thereof, that the plaintiff was nevertheless entitled to a verdict, without regard to the fact that the defendant had used a reasonably safe coupling and had properly installed the same.

However, as hereinbefore stated, I am of the opinion that the defendant was entitled to a peremptory instruction for the reason that there was no substantial evidence to show that it had not exercised the proper care to use and securely install a reasonably safe coupling, then and now in general use, for the pipe connection from which the gas escaped, and that even though the owner of the lot had the right to install thereon the garage wherever he should choose to locate it, the fact remains that the injuries to the complainant herein complained of were due to an accident which was not reasonably forseeable, the suit here being predicated on negligence and not upon any alleged duty to insure against a remote possibility.

**Smith** and **Roberds, JJ.**, concur in this dissent.

ON SUGGESTION OF ERROR.

**Hall, J.**

Appellant has filed an elaborate suggestion of error in this case, asserting as a necessity therefor the uncertain status under our former decision herein of the standard Dresser Coupling in standard gas service installation,

and basing its sole contention at the outset upon the following point: "Appellant, a public utility, had a contitutional right to install in this line a dresser coupling, hereinafter called 'Dresser'; so to do cannot constitutionally be declared negligence; this suggestion is limited to that constitutional point and the obligation of this court as an inferior court quo ad and must herein conform to that declared requisite by federal supreme court."

The same point was raised upon the original presentation of this appeal, and in our original opinion we stated "Appellant's concern rises above the usual interest in displacing an adverse verdict, and seems to involve an anxiety that an affirmance of the judgment would impliedly, if not directly, proscribe the use of the 'Dresser Coupling' which, he asserts, with testimonial support, has been widely used by this and other gas companies in uniting pipe sections. While we would not be privileged to share this concern as a troubling incident to a conclusion if compelled thereto by a legal necessity, we take occasion to state that neither the verdict nor our conclusions need carry such implication." Mississippi Power & Light Co. v. Thomas, Miss., 39 So. (2d) 759, 760. Our decision then proceeds to a conclusion upon the basis that the evidence in this case, and the reasonable inferences to be drawn therefrom, show that the Dresser coupling was not properly installed and connected. The very coupling from which the pipe in question became disconnected was produced in evidence and sent up to this court as an exhibit in the case. It measures slightly over six inches in length. Appellant attached to its original brief an appendix of twenty-four pages consisting of photographs, diagrams and cross-sections of the standard Dresser coupling, including a diagram showing that under proper installation the pipes should be inserted into the coupling so as to meet end to end in the center thereof. With the coupling herein evidence each section of the pipe in the service line should have been inserted for a distance of three inches into the coupling so as to connect the service pipes end to

end. The proof in this case jusifies the conclusion that one of the service pipes was not so inserted into the coupling. The ''Dresser Coupling'' in itself is recognized as a standard appliance which, when properly used, is perhaps as effective and safe as any other type of coupling, and its use by appellant is not prohibited or proscribed by our decision.

Notwithstanding the preliminary statement in appellant's suggestion of error limiting the same to the question just discussed, the appellant contends that the ordinance of Yazoo City is unconstitutional and brands appellant as a callous criminal. As was pointed out in our original decision, the fact of the existence of this ordinance was first brought out by appellant's counsel during the course of the trial, and the jury was clearly instructed that it was not appellant's duty to furnish any particular type of coupling and if the Dresser coupling was a standard, recognized and proper type of coupling, the appellant has a right to use it. The constitutionality of the said ordinance is not involved in this decision.

The suggestion of error is accordingly overruled.

Suggestion of error overruled.