# WILLMAR GAS COMPANY, INC., v. AMOS DUININCK AND OTHERS, *d. b. a.* DUININCK BROS. & GILCHRIST.[1]

May 9, 1952.

No. 35,728.

*Roy A. Hendrickson* and *George E. Hulstrand,* for appellant.

*Freeman, King, Larson & Peterson* and *Leo J. Lauerman,* for respondents.

CHRISTIANSON, JUSTICE.

This is an action for damages sustained by plaintiff as the result of a break in one of its service pipes allegedly caused by defendants'

[1]Reported in 53 N. W. (2d) 225.

negligence. After the jury had returned a verdict, for plaintiff, defendants made an alternative motion for judgment or a new trial. The trial court granted defendants' motion for judgment notwithstanding the verdict, and plaintiff appeals from that order.

Plaintiff, a Minnesota corporation, maintains a gas distribution system in the city of Willmar. In 1930, an east-west gas main, which had originally been installed on Benson avenue from Sixth street west to Second street west, was extended 175 to 180 feet east on the south side of Benson avenue. About the same time, a 3/4-inch north-south service pipe was connected to that main. It extended 71½ feet north of the main and then turned east for 5½ feet into a building housing a produce company. The service pipe was not in use in 1948 and so did not carry gas into the produce company building, though it held gas from the main.

Defendants are copartners engaged in the general contracting business. During the summer of 1948, they had a contract with the city of Willmar for the grading of certain streets in that city, including Benson avenue. On July 31, 1948, two of defendants' employes, Albert Becker and LeRoy Kaiser, began finishing operations on Benson avenue and spent most or all of the day on the block between First and Second streets west. The purpose of this work was to finish and smooth off the rough subgrading previously done by a subcontractor employed by defendants. Becker and Kaiser each operated a power patrol or blader equipped with a 14-foot blade behind the two front wheels. The large blades were used to produce a smooth surface by leveling the ridges and loose dirt left by the grading machines. Only Becker and Kaiser worked on the street that day. There was no one supervising their work, but both men denied cutting below the existing subgrade. The record discloses that during the original grading operations the subcontractor twice broke gas pipes, but notified plaintiff immediately in each instance. There was no evidence of any machines working on the street other than those owned or employed by defendants.

Becker testified that he pulled up a piece of pipe in a driveway a short distance east of First street off Benson avenue. He was

headed north in the driveway, which was on the east side of a viaduct that crossed Benson avenue at First street. The pipe Becker pulled up was 4½ or 5 feet long. It was old, filled with dirt, and appeared to be unattached to any other pipe. Becker denied pulling up any other pipe. Kaiser stated that he struck no pipe on Benson avenue. Neither man remembered smelling any gas during the work.

August Nelson, called on behalf of plaintiff, worked during the summer of 1948 for a lumber company located on the north side of Benson avenue between First and Second streets and about six feet west of the produce company building. Though he could not recall the exact date, he recalled seeing machines leveling off Benson avenue between Second and First after some grading had been completed earlier. Nelson testified that a grader which he saw doing this work hit and pulled up a pipe about 50 feet from where he stood in the lumberyard. He saw 6 or 8 feet of pipe being lifted up. The spot at which he saw the pipe being pulled up in the street was located about 6 feet east of a place where he later observed a bubbling up in a pool of water located about even with the east line of the lumberyard shed.

In September 1948, plaintiff noticed that there was a sharp increase during the month of August in its losses due to unaccounted-for gas. The latter term is the name given to the difference between the gas charged to plaintiff's customers and the gas purchased from plaintiff's supplier. A certain amount of loss is to be expected. Prior to August 1948, plaintiff's unaccounted-for gas averaged 3.99 percent per month. In August 1948, such unaccounted-for gas amounted to 25.5 percent of all gas purchased. On June 14, 1949, a leak was found in the service line on Benson avenue between Second and First streets, and that leak was capped. There was an immediate drop in the unaccounted-for gas loss. Between August 1948 and June 1949, plaintiff's unaccounted-for gas had averaged about 19 percent per month. After June 1949, plaintiff's loss averaged about 6.3 percent per month.

After the sharp jump in gas losses was discovered, plaintiff began an examination of its system to determine the cause. It was de-

termined that a break or breaks in the system were the probable cause of the losses, so that the examination of the system became a search for leaks. That search ended with the discovery of the break in the service pipe on Benson between Second and First streets. The service pipe was connected to the east-west main on the south side of Benson. The north-south service pipe had been severed at a point near the south curb of Benson and extending up to the north curb. A piece of the service pipe about 18 feet long was missing, and it has never been found.

Richard W. Stafford, a consulting gas engineer, was called by plaintiff. He had been hired by plaintiff in June 1949 to aid in the search for the leak that was the suspected cause of the heavy gas losses plaintiff suffered. One of his tests was to study the characteristics of the gas load between midnight and 4 a. m. Normally, there would be small consumer consumption during those hours, and so the gas pressure would be high. A large flow of gas, indicated by low pressure during those hours, would indicate that there was a large leak or leaks. The flow is determined by a Bristol recording-machine meter in plaintiff's main office which measures the pressure between the plant and the distribution system at that point. This portion of the distribution system encompassed the downtown system, which included the block between Second and First on Benson avenue. The pressure at the plant was maintained at five pounds at all times. Stafford pointed out that prior to July 31, 1948, between midnight and 4 a. m., the meter indicated a steady pressure of five pounds at the main office, the same as the pressure at the plant. On July 31, 1948, the meter indicated a steady pressure of only $4\frac{1}{2}$ pounds at the main office during the critical period. The $4\frac{1}{2}$-pound pressure continued during the observed hours until June 14, 1949, when the pressure during the crucial hours rose to five pounds and remained at that point until lowered by the company at Stafford's suggestion. It had been earlier established that a leak such as the one found on Benson avenue would be reflected on the Bristol recording chart.

Stafford estimated a loss of an average of 1,115,000 cubic feet of gas per month from the Benson avenue leak. He checked this approximation of the size of the Benson avenue leak by determining whether the estimated volume of lost gas could cause the pressure drop actually found. His calculations were made by estimating the pressure drop to be expected from the estimated volume of gas lost after considering the normal pressure drop to be found as the gas passed through the different dimensions of pipe. In this way, Stafford found the result of his calculations to be the approximate half-pound drop in pressure actually found.

In estimating the loss suffered by plaintiff from the gas leak, Stafford found the difference between the average monthly volume of losses prior to July 31, 1948, and the average monthly volume of losses from that date until June 14, 1949. The result was multiplied by the cost of gas during each month, and the results for each month were totaled in arriving at the monetary loss suffered.

The trial court granted defendants' motion for judgment notwithstanding the verdict on the ground that plaintiff's loss was too speculative and conjectural, both as to cause and as to amount. The only questions presented on appeal are: (1) Whether the evidence as to defendants' negligence presented a question of fact for the jury, and (2) whether plaintiff's damages were too speculative and conjectural to justify a verdict.

In Sorlie v. Thomas, 235 Minn. 509, 511, 51 N. W. (2d) 592, 594, we recently considered the granting of a motion for judgment notwithstanding the verdict. The rule applicable to test a verdict on such a motion was restated as follows:

"A motion for judgment *non obstante* accepts the view of the evidence most favorable to the verdict and admits every inference reasonably to be drawn from such evidence, as well as the credibility of the testimony for the adverse party, and if the application of this rule, in the light of the evidence as a whole, discloses a reasonable basis for the verdict, the motion must be denied."

Viewing the facts in the light most favorable to the verdict for plaintiff, as we must, they furnish a reasonable basis for the jury's finding on the issue of negligence.[2]

From his description of the work being done, witness Nelson provided a reasonable basis for the jury to conclude that he observed defendants' servants finishing the subgrading on July 31, 1948. Likewise, from his description of the pulling up of the pipe and its location, it was permissible for the jury to find that defendants' servants on that date did pull up the service pipe found missing on June 14, 1949.

Stafford's testimony then tied in the breaking of that pipe and the loss of gas from it with the extraordinary loss suffered by plaintiff in its system. His testimony established that on the same day that defendants' servants graded the block in which the leak was found to which the gas loss was attributed there was a sharp increase in the gas loss and a pressure drop in the system. When that leak was capped the gas loss decreased appreciably. The gas pressure went back to what it had been prior to the grading of the street. The estimated loss from that leak checked with the pressure drop actually experienced.

From the foregoing, it was not unreasonable for the jury to find that on July 31, 1948, at a time when defendants were aware of the existence of gas pipes below the surface, defendants' servants pulled up a pipe in plaintiff's system, thereby causing the leak that resulted in the extraordinary gas loss which continued until the condition was discovered and the broken pipe capped. 4 Dunnell, Dig. & Supp. § 7047.

Though the testimony on behalf of defendants supports a contrary conclusion, the issue of defendants' negligence was properly

[2] It is well established that a contractor performing work for a municipality in its streets is chargeable with the duty of reasonable care toward the owner of gas mains in the public streets, and that he is liable in damages for negligence in the performance of his work. Portland Gas & Coke Co. v. Giebisch, 84 Or. 632, 165 P. 1004, L. R. A. 1917E, 1092; Muskegon Traction & Lighting Co. v. City of Muskegon, 221 Mich. 251, 190 N. W. 708; 24 Am. Jur., Gas Companies, § 51; 38 C. J. S., Gas, § 49.

one of fact for the jury. Abbett v. C. M. & St. P. Ry. Co. 30 Minn. 482, 16 N. W. 266.

Defendants urge that the applicable rule is the one most recently discussed in Anderson v. Northern States Power Co. 236 Minn. 196, 208, 52 N. W. (2d) 434, 442, as follows:

"An inference of negligence based on an inferred fact, *of which there is neither evidence nor predominating probability,* cannot safely be made." (Italics supplied.)

That rule is clearly inapplicable here. There is evidence here from which to infer that defendants were responsible for a leak in the gas system. There is further evidence from which a jury might reasonably infer that the leak caused by defendants was responsible for the extraordinary gas losses sustained. Thus, viewing the evidence as a whole, it is our opinion that the inference drawn by the jury that plaintiff's gas loss was caused by defendants' negligence is reasonably supported by the evidence.

■ Plaintiff's damages are characterized as being too speculative to be the basis of an award.

The evidence discloses that plaintiff's unaccounted-for gas normally amounted to 3.99 percent of its total purchases. From July 31, 1948, to June 14, 1949, the unaccounted-for gas amounted to over 19 percent of the total gas purchased. Stafford estimated that loss in terms of cubic feet, and it was determined that a loss of the estimated volume of gas would cause a pressure drop very close to the one experienced from the Benson avenue leak. The monetary loss suffered from the gas leak was arrived at by multiplying the difference between the normal gas loss and the actual gas loss during each month of excessive loss by the actual cost of gas to plaintiff during that month. The results were then added, and the sum arrived at was the estimated monetary gas loss.

There is also evidence of the expenses plaintiff incurred in searching for the leak. This evidence included the reasonable cost of outside professional services, as well as the cost of the use of its own equipment and employes. There can be no question as to the

certainty of the proof with respect to a number of these items of special damage.

The uncertainty of the proof as to the gas loss suffered is obvious. There is evidence that there were other leaks in the system during the crucial period. However, the jury could have found that these smaller leaks were included in the normal gas loss Stafford assumed in arriving at his estimate of the loss caused by defendants' negligence. It is also true that after the Benson avenue leak was capped the unaccounted-for gas loss went down to 6.3 percent, but did not return to the average of 3.99 percent loss that existed prior to July 31, 1948. Stafford suggested that the unaccounted-for loss average might return to the earlier level if it were under observation for a longer period. But, he added, that in any event the amount was too small now to warrant an investigation.

Notwithstanding this uncertainty, a wrongdoer who is found to have caused harm should not be allowed to complain of the uncertainty of proof of damage if his own wrongdoing has caused the uncertainty. Story Parchment Co. v. Paterson Parchment Paper Co. 282 U. S. 555, 51 S. Ct. 248, 75 L. ed. 544. In Ellis v. Lindmark, 177 Minn. 390, 397, 225 N. W. 395, 397, this court stated:

"* * * The tendency of the court has been to ascertain damages, when an actual wrong has been done, though doing so involves labor, rather than to deny relief with the easy statement that the damages sought are too speculative and conjectural or too remote to permit a recovery." See, also, Watre v. G. N. Ry. Co. 127 Minn. 118, 149 N. W. 18.

Here, the computation of plaintiff's gas loss was made by an expert using recognized methods. While not absolutely accurate, his conclusions as to plaintiff's losses undoubtedly bear a reasonably close relation to the actual loss sustained. No expert testimony was offered to contradict Stafford's conclusions or to show that his estimates were not substantially correct. With this in mind the language of the Michigan court in Muskegon Traction & Lighting Co. v. City of Muskegon, 221 Mich. 251, 255, 190 N. W. 708, 709, seems particularly appropriate here:

"* * * It is true that there was no way to meter the escaping gas, and that it could not be said to an absolute certainty how much escaped because of the breaks in the main, but it does not follow that a wrongdoer may escape all liability because of the difficulty of establishing the extent of his wrongdoing."

It was error to grant defendants' motion for judgment notwithstanding the verdict of the jury in the instant case. Accordingly, the order appealed from must be reversed.

Reversed.