414 So.2d 437 (1982)
ENTEX, INC. and City of McComb, Miss.
v.
Ray McGUIRE and Leah Elizabeth McGuire.
No. 53067.
Supreme Court of Mississippi.
June 2, 1982.
*438 Gillis, Walman & Gillis, Robert W. Brumfield, McComb, Brunini, Grantham, Grower & Hewes, Jefferson D. Stewart, Newt P. Harrison, Jackson, for appellants.
Mounger, Mounger & Mord, Tylertown, Keith Starrett, Magnolia, Mike Smith, McComb, for appellees.
Before SUGG, P.J., and ROY NOBLE LEE and HAWKINS, JJ.
ROY NOBLE LEE, Justice, for the Court:
Three (3) suits were filed by Ray McGuire and Leah Elizabeth McGuire, his wife, in the Circuit Court of Pike County, Honorable Joe N. Pigott, presiding, for personal injuries and property damage, against Entex, Inc. [Entex] and City of McComb [McComb]. The cases were consolidated for trial, verdicts were returned and judgments entered in behalf of Mrs. McGuire for eighty thousand dollars ($80,000), personal injuries; Mr. McGuire for thirty thousand *439 dollars ($30,000), personal injuries; and the McGuires jointly for fifty-five thousand dollars ($55,000), property damage. Entex and McComb have appealed from those judgments.
On January 17, 1979, McComb sent a crew of men to repair a ruptured underground water line located on Locust Street in front of appellees' home. Julius Conerly was in charge of the crew and arrived at the site with a backhoe shortly after 7:00 a.m. Conerly had begun to dig with the backhoe into the asphalt and soil underneath in an attempt to find the water leak, when he struck an object which "gave in" to the backhoe. Another workman jumped into the ditch and discovered that Conerly had hit a gas service line with the bucket of the backhoe. The service line, which led to the McGuire home, was bent in the shape of a downward "U", but the pipe had not been ruptured at that point. Conerly then turned the backhoe around and proceeded to dig in the opposite direction.
Mr. McGuire saw the city crew when it arrived and began to work in the street. He went to his garden and worked for a time and then walked back inside his home for a cup of coffee. After drinking the coffee he went back to the garden. According to McGuire, he first smelled a strong odor of gas between 8:00 and 8:15 a.m. He thought the city crew had hit a pocket of trapped gas in the street, but was not alarmed. When the odor remained, he went back into his home and cut off the pilot on his heating unit. Later, he went outside and checked the gas meter, which was located approximately two and one-half (2 1/2) feet from the front of the house near some bushes. The dials registering the inflow of gas did not move indicating no gas was flowing through the meter. He also saw the bushes moving near the ground and felt a strong rush of gas rising up from the surface.
McGuire went to the street where the city crew was digging and told Conerly that he had found a gas leak in front of his house. He told Conerly he thought the backhoe had struck a gas pipe. Conerly turned off the backhoe, examined the spot where the gas was rising up out of the ground, and asked McGuire to call the gas company and report the leak.[1] McGuire went back into his house and told Mrs. McGuire to telephone the gas company and report that the city crew had struck a gas pipe while digging in front of their home. Mrs. McGuire called the Entex office and reported the incident.
At this time the McGuires were not aware of the dangerous situation created by the escaping gas, thinking it was leaking outside their home. They went about their usual routines and Mr. McGuire began to walk back to his garden. Mrs. McGuire picked up a cigarette and, although she did not remember exactly what happened, apparently struck a match. Gas had become trapped in the house and the flame from the match ignited it causing an explosion. McGuire had walked fifteen (15) to twenty (20) feet from the house when it exploded. He turned and saw it engulfed in flames and heard his wife screaming for help. A huge gaping hole had been blown in the side of the house and Mr. McGuire helped his wife get outside before a second explosion occurred. A neighbor heard the explosion, saw the fire, and telephoned the fire department. At 9:06 a.m. a unit was dispatched to the scene, arriving at the McGuire property four (4) minutes later. When the fire truck arrived, the house had been totally destroyed by the fire.
The explosion occurred at approximately 9:05 a.m. Representatives of Entex arrived upon the scene at 9:26 a.m. and the service line was "squeezed off" approximately an hour after the explosion. Investigation by the City Fire Marshal indicated that the fire began in the rear bedroom, where the escaping natural gas had apparently collected, and quickly spread throughout the frame building.
*440 The gas meter serving the McGuire residence was set at the front of the house. The vertical pipe to which the meter was attached, commonly known as a riser pipe, was connected to the service line with a six-inch dresser coupling. It consisted of a metal sleeve with a threaded nut and gasket on each end and was installed by loosening the nuts and gaskets, slipping in the two pieces of pipe to be joined and then tightening the nuts and gaskets around the pipe. The dresser coupling was manufactured by Dresser Industries, Inc., and had been installed and used at the McGuire residence for approximately twenty-three (23) years without incident.

I.
Did the lower court err in declining to grant the motions of Entex for a directed verdict and judgment notwithstanding the verdict?
The declarations charged that Entex was negligent in that (1) it used a dresser coupling in its service line at the McGuire residence, (2) the gas service line was at a negligently shallow depth, (3) the gas line was installed over and across the city's water main, (4) Entex failed to mark the service line, (5) Entex failed to provide a map indicating the location of its service lines to the City of McComb, and (6) Entex was not immediately prepared to cut off the gas from its service line. In overruling the motion for a directed verdict, the lower court stated the following reasons in support thereof: (a) The explosion and fire occurred within sixteen (16) minutes after Mrs. McGuire called Entex, and it could have responded in about five (5) minutes even though it did not do so until thirty-six (36) minutes later; (b) Entex should have reasonably foreseen the accident might occur when it used the dresser coupling; (c) Entex failed to mark the gas distribution service lines; (d) Entex failed to furnish the city with copies of their map designating the locations of the distribution lines; and (e) Entex was negligent in laying the gas line over and across the water line.
At the request of the appellees, the lower court submitted issues of negligence to the jury in two instructions: (1) P-16, whether or not Entex failed to use due care to mark the existence of its lines when it should have reasonably foreseen that there would be digging or excavating in the street where the service line was located, and (2) P-31, whether or not Entex reasonably could have foreseen that there would be digging or excavation in the street and that, under those circumstances, the use of a dresser coupling was dangerous or hazardous.
Appellees contend that Entex was negligent because it used the dresser coupling to connect the feeder pipe and service line at a point only 2 1/2 feet from the McGuire house. Richard Sanders, Chief of Pipeline Safety for the Mississippi Public Service Commission; Clinton Moak, an Entex crew foreman with twenty-one (21) years' experience; and Gerald Anderson, an engineer with fourteen (14) years' experience in the use, design and manufacture of dresser couplings; all testified that the procedure Entex followed in the installation and use of the dresser coupling is a normal and accepted practice in the natural gas industry. The uncontradicted testimony also established that dresser couplings are accepted and used extensively throughout the United States as permanent fittings and that the dresser coupling here was properly installed when it was originally put into service 23 years ago.
Mr. Pete Brogan, an expert witness called on behalf of appellants, testified he considered the couplings to be temporary fittings. However, he did not state the industry considered them to be temporary fittings and did not know whether or not other people used them as permanent fittings. Also, Brogan did not deny that they are manufactured and sold as permanent fittings. It was his opinion that the dresser coupling should not have been used to join the service line to the McGuire meter.
In Mississippi Power & Light Co. v. Thomas, 206 Miss. 201, 39 So.2d 759, on reh., 206 Miss. 229, 40 So.2d 597 (1949), Mississippi *441 Power and Light Company had laid a pipeline using dresser couplings and a garage was constructed over the pipeline. Approximately one month later, Thomas was injured when gas escaped from the line and was ignited by a spark from her automobile, while being started in the garage. An investigation disclosed that the pipeline had separated at one of the dresser couplings beneath the garage. This Court held that the jury was justified in believing that the garage would not have caused the pipeline to separate, if the dresser coupling had been properly installed, but emphasized that the decision was not to be construed as a condemnation of the use of dresser couplings. The Court said:
Appellant's concern rises above the usual interest in displacing an adverse verdict, and seems to involve an anxiety that an affirmance of the judgment would impliedly, if not directly, proscribe the use of the "Dresser Coupling," which, he asserts, with testimonial support, has been widely used by this and other gas companies in uniting pipe sections. While we would not be privileged to share this concern as a troubling incident to a conclusion if compelled thereto by a legal necessity, we take occasion to state that neither the verdict nor our conclusions need carry such implication.
* * * * * *
To insure against a condemnation by the jury of the Dresser Coupling, per se, the defendant procured instructions that if such coupling was generally accepted and used (and there was ample testimony thereto) and was itself reasonably safe, there could be no recovery "even though you may believe that a welded joint or rigid screw joint would not have broken or would have broken at some other point, without injuring the plaintiff."
It is evident, therefore, that the controlling issue was that of a proper installation in view of existing and reasonably foreseeable conditions... . [Emphasis added]. [206 Miss. at 215, 219, 39 So. at 760, 762].
This Court affirmed the jury verdict which was adverse to the gas company. On suggestion of error, the Court again reiterated that its decision was not a condemnation of dresser couplings:
[T]he evidence in this case, and the reasonable inferences to be drawn therefrom, show that the Dresser coupling was not properly installed and connected... . The proof in this case justifies the conclusion that one of the service pipes was not so inserted into the coupling. The "Dresser Coupling" in itself is recognized as a standard appliance which, when properly used, is perhaps as effective and safe as any other type of coupling, and its use by appellant is not prohibited or proscribed by our decision. [206 Miss. at 230-31, 40 So.2d at 597].
The expert witnesses in the case sub judice all testified that the pressure exerted by the backhoe would have broken the line somewhere. Mr. Brogan testified that, if the service line had been welded solid he was sure the pressure from the backhoe would have pulled the meter down.[2]
According to the evidence, McComb knew gas lines were buried beneath the streets, and, when it had done repair work in the past, at its request, Entex had marked its gas lines for the city. McComb knew that maps of the gas distribution system were maintained by Entex in the McComb office. The McGuire gas meter was situated at the front of the house and was visible to the crew working in the street.
The facts of Pioneer Natural Gas Co. v. K & M Paving Co., 374 S.W.2d 214 (Tex. 1963) are similar to the case sub judice. While doing construction work along a highway for the Texas Highway Department, K & M Paving Co. struck Pioneer's natural gas pipeline with a piece of earth-moving equipment. There was an explosion and fire which destroyed the equipment. In holding that the gas company was not responsible for the loss, the Court said:
As stated, there were along the pipeline right-of-way no signs stating a pipeline *442 was there, but there were adjacent to the right-of-way many gas meters, gauges and regulators. These various pipeline apparatus were clearly visible to the men working on the road. Immediately across the intersection from the accident was a large regulator or Christmas tree, plainly visible, which Kerr's men had inspected in an attempt to estimate the path and depth of the pipeline.
Kerr had not requested plats from either the Highway Department or from Pioneer showing the location of the pipeline. Neither the Highway Department nor Pioneer volunteered information or warning to Mr. Kerr of the path of the pipeline.
* * * * * *
... [T]he undisputed evidence is that the line was buried to such an extent that it took three or four passes of powerful digging or scraping machines to unearth the pipe.
Under these circumstances, the question is whether it is the duty of the pipeline company to continuously police its lines to keep others from interfering with them or being injured by them; or whether it is the duty of persons who do make an unusual or extraordinary use of the surface to find out where the lines are, and then either (1) avoid them or (2) request their relocation or that they be deactivated during operations, or to make reasonable inquiry so that it then becomes the duty of the pipeline company to make a disclosure of the location of its lines so that the other party may avoid striking the line.
* * * * * *

We think it sound, in the light of the cases hereinafter discussed, to hold that at least where the activity is in an urban street or road, and where an unusual or extraordinary use of the surface is necessary to unearth the pipeline, and where there is no contract, statute, ordinance or regulation governing the matter, the initial burden is upon the one who excavates or digs up the surface to avoid striking the line or to make reasonable inquiry as to the location of any line which might be encountered. The duty of the pipeline operator under these circumstances arises then, when it is requested to alter its lines or their use, when it is asked for information, or when it is otherwise put on such notice that it is required to take particular action to protect the line and property of others. [Emphasis added]. 374 S.W.2d at 217, 218-219.
In Wideman v. Mississippi Valley Gas Co., 507 F.2d 658 (5th Cir.1975), suit was brought against Mississippi Valley Gas to recover damages caused by an explosion and fire resulting when decedent hit an underground gas line while he was operating a small road grader. The Fifth Circuit Court of Appeals affirmed the district court's judgment for the gas company stating:
There can be little doubt that had Beasley or decedent inquired about the location of the gas line or in any other way conveyed to Mississippi Valley any information from which it could have concluded that the easement was to be graded, Mississippi Valley would have been under a duty to take some action... . But the record is clear that no one did anything to place Mississippi Valley on actual or constructive notice of the possibility of this particular road grader activity. Without such notice, a duty for defendant to take action could arise only if this type of accident and injury could have been reasonably anticipated. No duty would arise as to any "unusual, improbable, extraordinary and freakish accident" that, even though possible, a reasonable man would not have considered probable. Larco Drilling, supra, 267 So.2d at 310. [507 F.2d at 661].
See also Larco Drilling & Exploration Corp. v. Brown, 267 So.2d 308 (Miss. 1972); Mississippi Public Service Co. v. Cunningham, 189 Miss. 179, 195 So. 472 (1940).
In Hersum v. Kennebec Water District, 151 Me. 256, 117 A.2d 334, 53 A.L.R.2d 1072 (1955), the Court said:
The defendant then had a plain duty to notify the gas company so that further *443 examination might be made to ascertain whether other serious and concealed damage had been caused. The defendant elected to rely wholly upon its own cursory examination of the bent pipe and proceeded to act upon the erroneous assumption that this was an abandoned pipe... . Under somewhat similar circumstances the California court recognized that it is the duty of one who, while excavating in a street, strikes and bends a gas service pipe, to notify the gas company of the accident. Failure to give such notification is negligence. Rauch v. Southern California Gas Co., 96 Cal. App. 250, 273 P. 1111. [117 A.2d at 340].
The record does not reflect that Entex violated any statute, ordinance or regulation at the time of the McGuire explosion. We are of the opinion that Entex was under no duty to mark the natural gas lines in the urban area on Locust Street until notified of the excavation work; that there was no duty on Entex to follow McComb repair crews around the city to determine whether the gas lines would be damaged by them; and that Entex was under no duty to furnish maps or charts of the gas lines to McComb, unless requested by McComb. On the other hand, we think that it was the duty of McComb to notify Entex to mark its lines in the area of the repair work. De Vries v. City of Austin, 261 Minn. 52, 110 N.W.2d 529, 538 (1961); Willmar Gas Co., Inc. v. Duininck, 236 Minn. 499, 53 N.W.2d 225 (1953).
As stated before, the only issues of negligence submitted to the jury at the request of appellees were (1) the failure of Entex to mark the existence of its lines, and (2) Entex reasonably could have foreseen that there would be excavation in the street and the use of the dresser coupling at the meter was negligence under the circumstances.
We are of the opinion the evidence does not show that Entex was guilty of negligence which contributed to the explosion and fire and the lower court should have sustained the motion of Entex for a directed verdict.

II.
Were the verdicts of the jury excessive and should they be set aside?
To its credit, under the facts and circumstances of these cases, McComb concedes liability. However, it contends that the verdicts were contrary to the overwhelming weight of the evidence, were excessive, and show bias and prejudice on the part of the jury. At the outset, we note that the issue of whether or not the McGuires were guilty of contributory negligence was submitted to the jury.

(A) The $80,000 Award for Mrs. Leah McGuire.

Mrs. McGuire incurred medical expenses of twenty-six hundred dollars seventy-four cents ($2,600.74) and lost earnings of twelve thousand one hundred forty-four dollars sixty-four cents ($12,144.64). She is a registered nurse, sixty-five (65) years of age, and earned fourteen hundred dollars ($1,400) per month as Supervisor of Nursing Services at a McComb nursing home. She sustained fractures to three vertebra  C-12, L-1 and L-2; burns on her neck, arms, ears and scalp; permanent scarring on her legs and back; and permanent injury to the sciatic nerve. She also suffered excruciating pain at the time of the accident and following the accident and, according to Dr. Julian Janes, would continue to experience multiple back pains in the future.
This Court in Kinnard v. Martin, 223 So.2d 300 (Miss. 1969) affirmed a one hundred thousand dollar ($100,000) verdict for personal injuries, and the Court said:
Each suit for personal injury must be decided on the facts shown in that particular case. The amount of physical injury, mental and physical pain, present and future, temporary and permanent disability, medical expenses, loss of wages and wage-earning capacity, sex, age and health of the injured plaintiff, are all variables to be considered by the jury in determining the amount of damages to be awarded. [Citations omitted]. [223 So.2d at 303].
*444 On this evidence, we cannot say that the verdict of the jury was so excessive as to evince bias, passion and prejudice on the part of the jury, and we affirm the judgment for Mrs. McGuire.

(B) The $30,000 Award for Ray McGuire.

The record, which includes medical evidence, reflects that the explosions, fire and near loss of his wife[3] was a traumatic experience for Mr. McGuire. Dr. John Perry, a clinical psychologist, diagnosed Mr. McGuire as having anxiety neurosis and depressive neurosis. The condition extended for weeks and months after the accident. Mr. McGuire suffers from Parkinson's Disease and, according to Dr. Perry, his condition was aggravated by the anxiety neurosis and depressive neurosis. Dr. Julian Janes, Mr. McGuire's family physician, also testified that his Parkinson's Disease was aggravated due to the anxiety and resulting neurotic condition caused by the incident. He was unable to sleep at night and frequently had nightmares. He lost interest in doing things that he formerly enjoyed and he was seriously affected by the nervous condition. Mr. McGuire estimated his medical expenses, past and future, at approximately eleven hundred dollars ($1,100) and he had some loss of income.
In First National Bank v. Langley, 314 So.2d 324 (Miss. 1975), the Court cited Robb v. Pennsylvania R.R., 58 Del. 454, 210 A.2d 709 (1965), where it was held:
"When negligence proximately caused fright, in one within the immediate area of physical damage from that negligence, which in turn produced consequences such as would the elements of damage if a bodily injury had been suffered, the injured party is entitled to recover under an application of the prevailing principles of law as negligence and proximate causation." 58 Del. at 464, 210 A.2d at 714-15. [314 So.2d at 333].
The Court further said:
We, therefore, abandon the "impact doctrine" heretofore followed by this Court, so that hereafter genuine cases of injury growing out of the negligent acts of another  which are reasonably foreseeable as in other negligent cases  will not be dismissed simply because there was no trauma nor impact on the body of the injured claimant.
We are of the opinion that the facts in the instant case established a genuine claim which was subject to the determination of the jury and that the judgment of the trial court based on the verdict of the jury should be affirmed. [314 So.2d at 339].
The reasoning of the California Court in Dillon v. Legg, 68 Cal.2d 728, 69 Cal. Rptr. 72, 441 P.2d 912 (1968) in setting out the following factors in this type of claim is persuasive:
In determining, ... whether defendant should reasonably foresee the injury to plaintiff, or, ... whether defendant owes plaintiff a duty of due care, the courts will take into account such factors as the following: (1) Whether plaintiff was located near the scene of the accident as contrasted with one who was a distance away from it. (2) Whether the shock resulted from a direct emotional impact upon plaintiff from the sensory and contemporaneous observance of the accident, as contrasted with learning of the accident from others after its occurrence. (3) Whether plaintiff and the victim were closely related, as contrasted with an absence of any relationship or the presence of only a distant relationship. [68 Cal.2d at 740-41, 69 Cal. Rptr. at 80, 441 P.2d at 920].
We are of the opinion that, under the facts of this case, the issue of damages sustained by Mr. McGuire was properly submitted to the jury and that the award was not so large or excessive as to evince bias, passion and prejudice on the part of the jury, and we affirm the verdict for him.

(C) The $55,000 Property Damage Award.

The only testimony as to value of the house and personal property was that of *445 the appellees. Although extensive interrogatories were propounded to, and answered by, the appellees on the house and its contents, those interrogatories and answers were not introduced in evidence and the jury did not have the benefit of the damages itemized therein. Mrs. McGuire simply testified that the value of the house was thirty thousand dollars ($30,000) and the value of the contents was eighteen thousand dollars ($18,000). Property expert, Flynt Wilson, testified that the damage (value) to appellees' home was nine thousand one hundred forty-two dollars ($9,142.00). Mr. McGuire testified that damage to a small trailer parked near the home at the time of the fire was two thousand dollars ($2,000), yet he stated that it was repaired for fifty dollars ($50.00).
We are of the opinion that the evidence does not support a verdict of fifty-five thousand dollars ($55,000), property damage, that the verdict is excessive under the proof, and that the judgment should be reversed and remanded for a new trial on damages alone.
Accordingly, judgments against McComb in the amount of $80,000 for Mrs. McGuire and $30,000 for Mr. McGuire are affirmed; judgment for property damages in the amount of $55,000 is reversed and the case is remanded for a new trial on the issue of those damages alone; and all the judgments for appellees against Entex are reversed and judgment is rendered here for Entex.
AFFIRMED IN PART AND REMANDED ON THE ISSUE OF PROPERTY DAMAGES AS TO McCOMB; REVERSED AND RENDERED AS TO ENTEX.
PATTERSON, C.J., SMITH and SUGG, P. JJ., and BOWLING, HAWKINS and DAN M. LEE, JJ., concur.
WALKER and BROOM, JJ., dissent.
WALKER, Justice, dissenting:
I respectfully dissent from the majority upholding a $30,000.00 award in favor of Ray McGuire against the City of McComb.
In my opinion, this Court committed grievous error in adopting the rule announced in First National Bank v. Langley, 314 So.2d 324 (Miss. 1975) and doing away with the physical impact requirement as a prerequisite to recovery in personal injury cases.
The stage is now set for multiple person recovery in virtually every situation where one person is seriously injured and the tragedy is witnessed by the children or spouse of the injured party. In such a case, if the children and/or spouse are emotionally upset for a substantial period of time, have nightmares, become nervous or overly sensitive, experience productivity loss at work or school in the case of children, and seek medical attention to correct these conditions, then recovery may be had by each of these persons for damages suffered themselves from witnessing the original accident involving the close relative. Recovery by several children and the spouse of a victim will not be uncommon under the holding in this case and Langley, supra.
In my opinion, far greater harm will befall the citizens, farmers and businessmen of this State by continuing on the course charted by Langley, than would result from overruling Langley altogether or severely restricting its application.
The cost of protecting a person's home, farm or business from this liberal extension of liability arising out of simple negligence cases and resulting damage awards will rise sharply, and steadily increase to the point of being unaffordable by the masses whose livelihood depends on their automobile as a means of transportation. In short, a substantial portion of the average family's income will necessarily be spent on liability insurance coverage  money that could better be spent on homes, education of children, food and clothing.
I would reverse the award to Mr. McGuire and overrule or restrict the application of Langley, supra.
We endured without the rule for over 150 years and would be better off without it now.
BROOM, J., joins this dissent.
NOTES
[1] A segment of the pipeline over thirty-three (33) feet in length had been bent and pulled by the backhoe eleven and one-half (11 1/2) inches toward the street, thus causing a rupture at the point of a dresser coupling.
[2] This probably would have resulted in gas escaping at the house.
[3] Mr. McGuire literally pulled his wife from the burning home after the first explosion when practically one side of the house had been blown away.