ARNOLD *v.* SPEARS.

Apr. 13, 1953

No. 38722.        27 Adv. S. 1        63 So. 2d 850

*Chas. S. Mitchell,* for appellant.

*Thos. L. Wallace* and *Amy Burkett,* for appellee.

McGᴇʜᴇᴇ, C. J.

This is a suit for actual and punitive damages against the defendant E. R. Arnold, Sr., doing business as Arnold's Funeral Service, on account of his alleged refusal to deliver the body of the plaintiff's deceased son unless and until the purchase price of the casket, embalming and certain other charges made by the funeral home were first paid.

The suit was originally based on the alleged breach of the terms of a burial insurance policy in favor of the plaintiff Mollie Spears and her two sons, Freddie and Willie Spears, and also on the alleged wrongful conduct of the defendant in requiring the payment of a larger sum of money than that which the plaintiff claims had been agreed upon between the parties, after the defendant had denied liability under the burial policy.

Upon the first trial of the cause there was submitted to the jury only the question of actual damages, and there was a verdict in the sum of $1,000.00 in favor of the plaintiff. The trial court ordered that a remittitur be entered by the plaintiff so as to reduce the judgment to the sum of $300.00. The plaintiff declined to enter the remittitur and consequently the judgment was set aside and a new trial granted.

Upon the second trial the court submitted to the jury the question of both actual and punitive damages upon the theory that there had been a willful and wanton refusal on the part of the defendant to deliver unto the plaintiff the body of her son Willie Spears without the

prepayment of all of the items charged by the funeral home, both accrued and to accrue, in connection with the purchase of a casket, the embalming of the body, transportation from the home to the cemetery and for conducting a "wake" at the home of the plaintiff. A verdict for $1,000.00 was also rendered on the second trial in favor of the plaintiff. It is because of the alleged errors committed on this trial that the appeal here is taken.

Upon motion of the defendant made prior to the beginning of the second trial the court required the plaintiff to elect as to whether she would proceed on the action ex contractu or the action ex delicto alleged in the declaration. She elected to proceed on the latter. The defendant had admitted in its answer the issuance of the burial policy in favor of the plaintiff and her two sons, including Willie Spears, the deceased, as aforesaid, but denied liability on the policy on the ground that the plaintiff in her application for the same had declared that neither of the beneficiaries named therein "had required the attendance of a physician within sixty days," prior to the issuance of the policy, and that they were all then in good health, when in truth and in fact the said Willie Spears had been attended by a physician within much less than sixty days prior to the issuance of the policy and was in a dying condition at that time.

The proof on behalf of the plaintiff disclosed that Willie Spears died on Sunday evening, May 13, 1951; that relying upon her burial policy the plaintiff requested the defendant Arnold, as owner of Arnold's Funeral Service, which had issued the policy, that he take charge of the body, which was accordingly done. On the next day some members of the family, other than the plaintiff, went to the funeral home where they were advised that the defendant wouldn't bury the deceased "on the policy," and that he denied liability thereon. They reported this fact to the plaintiff, together with the request of the

defendant that she come to see him about the matter. It appears from a written agreement thereafter entered into between the plaintiff and the defendant, being dated May 14, 1951, she agreed to pay $150.00 for a casket, which she then selected and caused the body to be placed therein, and $25.00 for the embalming, $25.00 for transportation of the body from the home to the cemetery, $1.00 for a tie, $1.00 for gloves, and $15.00 for conducting "a wake" at the home of the plaintiff during the night before the burial, which was to be held on Thursday, May 17th.

The above items were listed in the written agreement, and amounted in the aggregate to $217.00, and of which amount $200.00 was paid on Tuesday, May 15th, and the body was to be delivered on Wednesday.

The plaintiff testified that "I signed papers to pay him $200.00 for the funeral and I thought the funeral was paid for," but she was not asked, and did not testify, as to whether or not the items for the tie, gloves and conducting the "wake" were listed in the writing along with the price of the casket, the embalming and the transportation charges when she signed the agreement. In other words, she did not testify that these items were inserted after the execution of the written agreement. Nor did she deny that the defendant "set up the wake" with lights, etc., and furnished an attendant at the "wake" for the night, after she had paid the $217.00 called for in the contract, as testified to by the defendant. She merely testified that she had the "wake" at her home, that "I waked him at my home."

The plaintiff admitted that at the time she signed the agreement in writing she did not have the money with which to pay the charges; that she collected about $420.00 on the next day on a life insurance policy of her deceased son, out of which she paid the first $200.00, saying that "I paid $200.00 when he brought the body home. They asked for $17.00 more. *  *  *." She also testified that

Wilson, an employee of Arnold, then ''went to the office and rung me back and stated that he must have $17.00 more.'' It appears that after Wilson collected the $200.00 from the plaintiff at her home, before he delivered the body there, he had gone back to the office and phoned the plaintiff that there would be $17.00 more. She was asked, ''What time did you actually pay Arnold $200.00? A. The same day that I signed that paper. Q. You signed the paper on the 14th, that was the day he died. A. I think I paid Arnold on the 15th.'' The body was delivered to the home on Wednesday, May 16th, which was the time that the same was to be delivered before the ''wake'' was conducted that evening. She was further asked, ''Q. After you paid Wilson the $17.00 did they bring the body to your house? A. Yes. In about 10 minutes.''

After the second trial, the official court reporter died before he transcribed his stenographic notes. They were later transcribed by another reporter, and were accepted by the parties as being substantially correct for use on this appeal. The reporter who undertook to transcribe the notes made by the official reporter, stated in several places in his transcript that ''I can't transcribe verbatim here.'' And he undertook to show the substance of what the notes disclosed. For instance, following the answer where the plaintiff stated that the body was brought to her home in about 10 minutes after she paid the additional $17.00, the record before us states ''Can't transcribe verbatim here, gist is that Wilson told her that Arnold wanted another $38.00 for the burial on the next day after the body had been delivered at the home of the plaintiff, and which additional amount she declined to pay.'' The defendant testified that this additional amount was to cover a contemplated charge of four automobiles at $5.00 each to transport the members of the family from the home to the cemetery and return, and

$3.00 for one additional car, and a $15.00 charge for opening and closing the grave, in the event he buried the body.

After declining to pay the additional $38.00 the plaintiff arranged with another undertaker to carry the body from the home to the cemetery and inter it at a cost of $19.00. But this additional demand was not made until after the body had been delivered in the casket at the home of the plaintiff and after the "wake" had been conducted. Therefore, there was no refusal to deliver the body to the home of the plaintiff without the additional $38.00 being first paid. And the lawsuit as tried was predicated solely upon a willful and wanton refusal of the defendant to surrender the body to the plaintiff until the entire $217.00 had been paid. ■■ What occurred after the delivery of the body to the home of the plaintiff is immaterial on the issue of whether there had been a wrongful refusal on the part of the defendant to surrender the body to the plaintiff. The case must stand or fall on what occurred prior to the delivery of the body at the home of the plaintiff, as tending to constitute an attempt to hold the body as security for the payment of the charges theretofore agreed upon.

The only testimony on behalf of the plaintiff as to whether or not the defendant attempted to hold the body as security for the charges agreed upon by her in writing, is disclosed by the following questions and answers: "Q. When you paid $200.00 did you ask Arnold to send the body to you? A. Yes. Q. Did he do it? A. No, sir. Q. Did he demand more money? A. Yes, and after that I didn't see him any more until I paid him more money. Q. You paid him more money? A. Yes." The record discloses that she was then talking about the $17.00, since she says that "after I paid the $17.00 he brought it." As against this testimony the defendant claimed that no demand was made of him to deliver the body of the deceased to the plaintiff, and that he delivered the same to her home on Wednesday, as originally agreed upon, and

she does not contend that this was, to have been done before that time.

One of the questions now presented is whether or not the plaintiff waived her right to the immediate possession of the body without paying the additional $17.00 covered by her written agreement, since she testified that "he (Wilson) told me that Arnold said to get more cash, $17.00, and I told him to come on, that I had the money." In other words, if she had declined to pay the additional $17.00, and had thereupon demanded the surrender of the body, and its surrender had been refused, the defendant would unquestionably be liable for damages for a detention of the body, if it be true, as she contends, that she had theretofore fully paid for the merchandise that was to be delivered to her home in connection with the body and for the service, and the defendant was demanding additional money.

The written agreement signed by the plaintiff expressly stated, following the itemized statement which aggregated $217.00, that "I   *   *   *   agree to pay the above   *   *   *   on or before May 17, 1951." And the bill is marked "Paid" on May 16, 1951, as shown by an endorsement on the agreement made by the defendant's employee Wilson on that date, and the plaintiff thereupon accepted the tie and gloves furnished by the defendant at the total cost of $2.00 and the services for conducting the "wake" that evening at a charge of $15.00, aggregating the $17.00 in dispute, after she had paid the full sum of $217.00 so contracted for in writing.

The plaintiff introduced as a witness one of her attorneys to prove that such attorney had phoned the Arnold Funeral Home, asked for Arnold and talked to him over the telephone while the body was at the said defendant's place of business. The attorney testified that "at that time I made demand on Arnold over the phone that he bury the body of Willie Spears. And Arnold at that time told me that he would not bury the body, and he gave me

his reasons—unless he was paid. I then asked him the amount of his charges and he told me $200.00 and he would not bury the body unless he was paid.'' Evidently the $200.00 had not been paid at that time, covering the cost of the casket, embalming, and the transportation charges for carrying the body from the home to the cemetery. There is no proof in the record that possession of the body was demanded by the plaintiff, or by her attorney, separate and apart from the merchandise that the defendant had agreed to furnish in connection with the burial.

While there is no precedent decision in our jurisprudence that has been called to our attention on the precise question here involved, it is stated in substance in the case of Southern Life and Health Insurance Co. v. Morgan, 105 So. (Ala.) 161, that ▮▮ a dead body is not property in the common commercial sense of that term and that the right of possession for burial is a legal right coupled with certain duties which the courts will protect, and that an unlawful interference with these rights is a basis for a suit for damages. That case, however, involved the refusal of a life insurance company to surrender to the beneficiary a certificate of death that had been furnished to the company in connection with the proof of loss, and a delay in the burial of the insured was caused by the necessity of obtaining another certificate of death in order to obtain a permit for the burial.

And it was held in the case of Kirksey v. Jernigan, 45 So. 2d (Fla.) 188, that an undertaker cannot retain the body of the deceased as security for his charges, and especially where the undertaker has taken custody of the body without authority to do so and demands payment of an unreasonable and unauthorized charge for embalming as a condition precedent to the surrender of the body.

In the Kirksey case, supra, it was also held that while ▮▮ recovery cannot be had for mental pain and anguish unconnected with physical injury, in an action arising

out of the negligent breach of a contract whereby simple negligence is involved, such rule does not apply to cases founded purely in tort, *where the wrongful act is such as reasonably to imply malice,* or where, from entire want of care or attention to duty or great indifference to the persons, property, or rights of others, such malice will be imputed as would justify assessment of exemplary or punitive damages.

However, as we understand the imperfectly transcribed testimony made from the notes of the former court reporter in the instant case ▮▮ the defendant was guilty of no wrongful act such as was reasonably calculated to either cause the plaintiff to suffer mental pain and anguish or that amounted to a willful, wanton and reckless disregard of her rights to such an extent as to reasonably imply malice or a wanton disregard of his duty to her in the premises. The plaintiff testified that after being advised that she would be required to pay the additional $17.00 claimed on the funeral bill, she told the defendant's agent over the phone "to come over here, I have the money and come to my house and get the money", and that when she paid the remaining $17.00 "then they brought the body to my home". And she further testified that "I told him to come on, that I had the money"; and it is clearly shown that the payment of the $17.00 additional to the $200.00 paid the day before was in compliance with her written agreement in that behalf, voluntarily entered into, and not a payment agreed to be made under coercion at the time of the execution of the written agreement in that behalf.

Moreover, it is undisputed that under the agreement of the parties, the body of the plaintiff's son was to be delivered to her home on Wednesday, May 16th, and that this was done, but the plaintiff said she had requested three times that it be brought on to her home, before it was brought.

The defendant had learned from the plaintiff on Monday, May 14th, that she had no money with which to pay for the casket or any other service to be rendered in connection with the preparation of the body for burial by the defendant. It was then that the plaintiff entered into the written agreement as aforesaid, in anticipation of the collection of some life insurance money, and then on the next day collected the $420.00 on a life insurance policy on her deceased son, and thereupon paid $200.00 on the funeral bill; and it appears that the defendant had good reason to believe that the plaintiff had sufficient funds left from the life insurance with which to pay the remaining $17.00 on the day when the tie, gloves, casket and body were delivered, and before the additional service should be rendered in conducting the "wake" at her home that evening, and that she would be willing to do so. Therefore, his request that the additional $17.00 should be paid to the defendant's agent that day before these additional items of merchandise were delivered to the plaintiff, along with the body and casket, and before the "wake" was conducted, was not an unreasonable or oppressive requirement such as to justify the award of exemplary or punitive damages.

The plaintiff had theretofore recognized that the defendant's contention was well founded when he denied that he was under any obligation to bury the deceased under the burial policy, in that she had voluntarily agreed in writing to pay the funeral bill, notwithstanding that she then held a burial policy issued by the defendant on which the premiums had been fully paid and on which the defendant had denied liability because of her alleged misrepresentations in the procurement of the policy. His recent experience with the plaintiff was such as to give the defendant good reason to believe that he was justified in requiring the prepayment of the additional $17.00 before delivering the additional items of merchandise, along with the body and the casket, at her home, and

then conducting the "wake" that evening for which $15.00 of the $17.00 balance was to be paid, according to the written agreement entered into two days prior thereto.

We therefore conclude that in the absence of a complaint in regard to any indignity to the body, or any disrespectful, wanton or willful conduct on the part of the defendant toward the plaintiff in connection with the withholding of the body from her temporarily and until the additional $17.00 could be collected, the plaintiff would not be entitled to damages for mental pain and anguish, disconnected from willful or wanton conduct such as would imply malice and justify the award of punitive damages. This view is not contrary to our own decisions as to the recovery of damages for mental pain and anguish when disconnected from physical injury or such a willful or wanton wrong, and it is not contrary to the holding in the Kirksey case, supra, or the weight of authority cited in the annotation under that case as reported in 17 A. L. R. 2d, p. 766.

The alleged right to recover damages for mental pain and anguish and also punitive damages was submitted to the jury under instructions given for the plaintiff, and the instruction on punitive damages did not leave it to the discretion of the jury as to whether or not the same should be awarded. In fact, neither of such rights of recovery should have been submitted to the jury under all the facts and circumstances disclosed by the record now before us.

The cause must therefore be reversed and remanded for a new trial under the rules of law herein announced.

Reversed and remanded.

*Hall, Kyle, Holmes* and *Lotterhos, JJ.,* concur.