314 So.2d 324 (1975)
FIRST NATIONAL BANK
v.
James LANGLEY.
No. 47996.
Supreme Court of Mississippi.
May 5, 1975.
Rehearing Denied July 7, 1975.
*325 Watkins & Eager, W.F. Goodman, Jr., Thomas M. Murphree, Jr., Jackson, for appellant.
Davey L. Tucker, Jackson, for appellee.
Before RODGERS, INZER and WALKER, JJ.
RODGERS, Presiding Justice.
The plaintiff James Langley brought suit in the Circuit Court of the First Judicial District of Hinds County, Mississippi, against the First National Bank of Jackson, Mississippi, for damages sustained by reason of the bank's negligence. The trial court entered judgment for the plaintiff in the amount of five thousand three hundred and thirty-nine dollars ($5,339.00) in accordance with the jury's verdict. From this judgment, the bank appeals, arguing the following assignments of error:
(1) The court below erred in failing and refusing to grant defendant-appellant a peremptory instruction;
(2) The court below committed error in authorizing upon a finding for the plaintiff, damages including physical and mental pain and suffering of the plaintiff;
(3) The court below committed error in authorizing, upon a finding for the plaintiff, damages including loss of earnings and loss of earning capacity;
(4) The court below committed error in submitting to the jury the question of whether or not the bank was negligent or exercised ordinary care and diligence in finding the deposit;
(5) The court below erred in overruling defendant's motion for a judgment non obstante veredicto or for a new trial; and
(6) The verdict of the jury is contrary to the overwhelming weight of the evidence and not supported by the evidence and contrary to the law and evidence.
*326 Mr. Langley cross-appealed, submitting the following sole assignment of error: The trial court erred in refusing to grant the instruction of cross-appellant (plaintiff below) allowing the jury to assess punitive damages, in addition to actual damages, and further erred in granting the instruction of cross-appellee which expressly denied the jury the right to consider punitive damages without defining or describing what such a term encompasses in relation to actual damages.
The plaintiff has worked for the Great Atlantic & Pacific Tea Company (A & P) for twenty-two (22) years. He has worked his way up from a produce helper to the manager of the Canton Road Plaza A & P Store, a position that he held for three and one-half years prior to the incident in issue.
The A & P had for years carried an account with the First National Bank of Jackson (bank). Deposits to the account were made usually by the managers of the various stores and the duplicate deposit slips were mailed by the bank to the New Orleans office of A & P. On Saturday, July 22, 1972, the bookkeeper at the Canton Road Plaza A & P made up two deposit slips and put them with cash and checks into two drawstring deposit bags as she customarily did every Saturday. One deposit was made up from the morning's receipts, and the other was made up from the afternoon's receipts. After the store closed and the deposits were made up, the plaintiff, as manager of the store, took the two deposits to the Woodland Hills Branch of the First National Bank. The plaintiff used his key to open the night deposit box, placed the first deposit into the box and closed the drawer. He then opened the drawer to check that the bag had slid down. He then placed the second bag into the box, went through the same procedure of checking the drawer, and then closed the door and locked it.
On Monday, July 31, 1972, the New Orleans office of A & P notified the plaintiff that it had not been sent a duplicate deposit slip for one of the deposits of July 22, 1972, totalling two thousand three hundred and ninety-two dollars and fifty cents ($2,392.50), which had been reported by the plaintiff to the New Orleans office. The plaintiff immediately notified the head teller of the bank, Mrs. Sarah Somers, of this fact. Mrs. Somers checked the records, acknowledged that two deposits had been made every Saturday in the past, but stated that there was no record of the deposit in question having been made. The plaintiff stated to her, "That thing's got to be hung up in there because I dropped it," and he asked her to get the key and look. She took him to see the Assistant Cashier, Mr. Bill Fisher. The plaintiff repeated the story and again requested that the night deposit box be checked. Mr. Fisher was hesitant in doing so, but was instructed to get the key by a superior, Mr. Dexter Barr, who had overheard the conversation.
The first search was then made by Mr. Fisher and a teller, Miss Christy Johnson. They opened the vault and looked up inside the chute, and then went outside and dropped a legal size envelope down through the chute. They concluded that the deposit was not there. There is conflicting testimony that Miss Johnson said, "It's dark [in the chute]. Anyone got a flashlight?" None was provided. Throughout the entire search, the plaintiff continually pleaded that the deposit had to be hung up in the night depository.
The plaintiff then returned to his store and had his bookkeeper call the Accounting Service Department of the bank's main office to check their records. They reported no record of such deposit having been made. The plaintiff continued calling the bank once or twice daily that week inquiring about the deposit.
On Friday, August 4, 1972, Mr. Rudolph Bryan, the vice-president and manager of the Woodland Hills Branch of the bank, came to the plaintiff's store to explain the procedures of receiving the night deposits inside the bank. The plaintiff insisted that the deposit was in the deposit box somewhere. *327 Mr. Bryan stated that he knew of no way the deposit could have hung up in the box, but suggested, "I don't know what happened, unless it didn't go all the way through, and when they pulled the lid back open somebody got it out." Mr. Bryan testified that he may have told the plaintiff, "There's no way it could be hung up."
Also, on probably what was that same Friday, the supervisor of A & P, Mr. C.W. Miller, went to the bank to talk with the manager Mr. Bryan about the deposit in response to instructions from the auditors of A & P in New Orleans. Mr. Bryan opened the night deposit vault and looked up into the chute, and then went outside and dropped a bag of coins down the chute in an attempt to dislodge anything that might be hung up. The missing deposit was not found. Mr. Miller asked Mr. Bryan if there was "any possible way to help us be assured that it wasn't hung up in that night depository." According to Mr. Miller's testimomy, Mr. Bryan indicated that "he'd investigated it and dropped those sacks of change through there, and he couldn't see how it was hung up in there."
The next day, Saturday, August 5, the plaintiff was requested by his supervisor, Mr. Miller, to take his two-week vacation and turn in his store keys. In his absence, the locks on the store doors were changed; five auditors came in and audited the books, inventoried all stock in the store, and audited the books again. The plaintiff worried himself sick during his vacation, wondering what had happened to the deposit. He could not sleep at night. He and his wife went to Texas, but after two days he had to return to see if he could find out more about the deposit. When the plaintiff returned to work, the supervisor had transferred him to another store as assistant manager, giving as the reason that it was due to the "troubles" in the store.
The evidence is not clear, but there is some evidence to indicate that additional searches of the night depository system were made by other employees of the branch bank.
Several weeks later, the A & P auditor in New Orleans called the bank's auditor in Jackson, Mr. Hugh Pierce, in an attempt to locate the missing deposit. On August 24, 1972, Mr. Pierce and an assistant auditor, Mr. Rod Carney, came to the bank to inspect the night deposit system. They opened the depository from the inside. Mr. Pierce lay down on his back and stuck his head in the vault. Mr. Carney went on the outside and opened and closed the door and worked the mechanism. They saw nothing. They then reversed the procedure with Mr. Pierce going outside and Mr. Carney staying inside. After about fourty-five minutes Mr. Carney caught a glimpse of "something." They both looked closer. Mr. Pierce testified, "There was a slight opening in the mechanism, and he pointed out to me and we looked closer; and I said that possibly could be fabric of some sort that we could see." Mr. Pierce immediately called the manufacturer, Diebold, Inc., to send someone out to dismantle the mechanism.
Mr. Lloyd Magee, the representative of Diebold, Inc., came to the bank and brought the service manager with him. Within twenty minutes they removed the depository head and found the missing deposit bag trapped between the flipper plate and the back plate of the hopper. Mr. Magee testified that he had never seen a bag get caught completely behind the flipper plate as this one had, but that when using a drawstring bag, it is "very easy for either the ball on the end of the string, or the string itself to become snared at the edge of the flipper plate and hang, and when the flipper plate comes back to his home position, it will throw it right behind the flipper plate." The evidence did show, however, that deposits had been known to get lodged in night deposit boxes.
The information of the discovered deposit was immediately conveyed to the *328 plaintiff by the bank's branch manager, Mr. Bryan.
In the meantime, the plaintiff had suffered physical and mental pain as a result of his worrying about the missing deposit. He had been referred to a psychiatrist, Dr. W.L. Waldron, who testified that the physical and mental problems of the plaintiff continued even after the deposit was found. He stated that the plaintiff suffered from anxiety neurosis, with depression, and with paranoia, causing overbreathing, muscular tension, shaking, excessive sweating, and acute response to sudden noises. He also suffered from angioneurotic edema, which resulted in the swelling of the lower lip, the tongue, and the upper lip. The swelling was so severe on occasions that the plaintiff had difficulty breathing and consequently had to be rushed to the hospital emergency room. He and his wife, Mrs. Joyce Langley, testified that the plaintiff had severe nightmares, and would wake up in the middle of the night and vomit. Mrs. Langley stated that since the deposit was lost, the plaintiff became "an entirely different person."
Dr. Waldron testified that the plaintiff's reaction was caused by the following:
"[I]t was caused by the fact that he was under suspicion of stealing a deposit of some $2300, and through that suspicion losing a position that he had worked for a good many years to attain, and by not being in a position to prove his innocence, and feeling a threat to his future security through reduced pay; and a further sense of frustration in being trapped in that he had 23 years of seniority with this particular company, along with retirement rights accumulation; a sense of inadequacy because of limited education, and this thing having arrived at a period of life in which it would be extremely difficult for him to go out and find similar work or to train for a new job; and the knowledge that even though he was ultimately found not to have stolen the property that the word more or less had gotten about as far as he was concerned. And so he felt he had a strike against him on that score."
The plaintiff sued the bank for the physical and mental injuries resulting from the mental distress caused by the bank's negligence, for a loss of income from being demoted, and for medical expenses  actual damages in the amount of fifty thousand dollars ($50,000.00). He further demanded twenty thousand dollars ($20,000.00) in punitive damages, due to the malicious and oppressive actions of the bank with a wanton disregard for the rights and feelings of the plaintiff.
The trial court refused to give a directed verdict for the bank rejecting the argument that physical injury accompanying mental anguish must be the result of an impact. The trial court further held that there was no evidence to justify the submission of the issue of maliciousness or willfulness to the jury, thus eliminating any award for punitive damages. The jury returned a verdict of five thousand three hundred thirty-nine dollars ($5,339.00) for the plaintiff.
After a careful study of the facts and the applicable authorities, we have reached the conclusion that appellant's Assignment of Error No. 1 is not applicable, because this is not a suit based on a contract [ex contractu], but is one based upon negligence [ex delicto], a tort action.
We hold that Assignment of Error No. 2 is not well taken, because we are of the opinion that from the facts shown in this case, the appellant bank should have anticipated that an employee who is trusted with money is likely to lose his position and perhaps be prosecuted for embezzlement if he loses funds, the loss of which cannot be explained, resulting from the negligence of another. Moreover, an agent who loses the money belonging to his principal may be expected to suffer mentally and physically.
*329 We hold that the plaintiff was properly permitted to recover loss of earnings and loss of earning capacity in view of our holding hereafter as to the recovery of damages for physical injury growing out of humiliation and mental distress.
We are of the opinion that the appellant bank owed the agent of one of its customers the duty to receive and properly credit to the account of its customer funds entrusted to the agent, and for which he is liable. Moreover, when these funds were lost in a mechanical depository machine after they have been deposited therein, it becomes the duty of the bank to make a reasonable inspection of the machine to determine the cause of the loss. Brunt v. Chicago Mill & Lumber Co., 243 Miss. 607, 139 So.2d 380 (1962); 38 Am.Jur. Negligence § 24, at 667 (1941).
The issue as to whether or not the bank exercised reasonable care in finding the lost deposit was a question for the determination of the jury. Miss. Code Ann. § 11-7-17 (1972). The jury could have, and apparently did, consider the fact that since the appellant advised the bank that he put the money in the "night deposit" machine, the agents of the bank should have known the money was in the "night deposit" machine somewhere. They should have done what they finally did, namely, have the machine examined by someone who knew how to inspect the machine.
We hold that the bank owed the appellant Langley the duty to carefully inspect the "night deposit" machine under the facts here shown.
The question that has given this Court considerable concern and has prompted much study is the point raised by the appellant in its argument, as follows: Can an individual recover damages for the physical consequences of shock, fright, or similar mental disturbances proximately resulting from a negligent act which was unaccompanied by any physical impact?
The doctrine denying recovery for physical injuries due to fright without impact had simultaneous origins in England and America. In Victorian Railways Commissioners v. Coultas, 13 App.Cas. 222 (1888), and in Lehman v. Brooklyn City R.R., 47 Hun. 355, 14 St.R. 575 (N.Y. Sup. Ct. 1888), it was held that recovery would not be allowed since there was no precedent for it. In England the Coultas case was repudiated and in Dulieu v. White & Sons, [1901] 2 K.B. 669, the rule was established to allow recovery for physical injury resulting from nervous shock without the existence of an actual impact. In Scotland the doctrine of the Coultas case was repudiated in the case of Gilligan v. Robb, [1910] Sess.Cas. 856, where recovery was allowed for an illness due to nervous shock without impact. In Ireland the doctrine allowing recovery had already been established prior to Coultas in Byrne v. Great Southern & Western Ry. of Ireland, [unreported], and was further strengthened in the case of Bell v. Great Northern Ry. of Ireland, 26 L.R.Ir. 428 (1890), where the recent decision in the Coultas case was repudiated. See Throckmorton, Damages for Fright, 34 Harv.L.Rev. 260 (1920).
In the United States, a uniform doctrine with respect to recovery for physical injury resulting from nervous shock without impact has never been developed. Several of the larger states initially adopted a view denying recovery which became the weight of American authority of the late 1890's. By 1921, a number of states and the United States Ninth Circuit Court of Appeals had established the doctrine of denying recovery. See Annot., 11 A.L.R. 1119, 1120 (1920); Throckmorton, Damages for Fright, 34 Harv.L.Rev. 260, 264 n. 25 (1920). However, an increasing number of states had been adopting the rule allowing recovery. See Annot., 11 A.L.R. 1119, 1134 (1921); Throckmorton, Damages for Fright, 34 Harv.L.Rev. 260, 265 n. 28 (1920).
According to the author of Annot., 11 A.L.R. 1119 (1921), by 1921, eleven states *330 had denied recovery, while ten states had allowed recovery. In 1926, an updating of the annotation appeared in Annot., 40 A.L.R. 983 (1926), where the total number of states denying recovery remained at eleven, but the number of states allowing recovery increased to twelve. In 1932, an updating of the annotation appeared in Annot., 76 A.L.R. 681 (1932), where the total number of states denying recovery remained at eleven, but the number of states allowing recovery increased to fourteen. In 1935, an updating of the annotation appeared in Annot., 98 A.L.R. 402 (1935), where the total number of states denying recovery remained at eleven, but the number of states allowing recovery increased to fifteen.
In a new annotation at Annot., 64 A.L.R.2d 100, 134 (1959), the author stated:
"Many courts early refused to allow recovery where the physical injury complained of resulted solely from the internal operation of mental or emotional stresses, unless there was, coincident in time and place with the occasion producing the mental stress, some physical impact which also resulted directly from the defendant's fault, and although this rule has since been rejected by a large number of courts, it is still apparently in force in several jurisdictions."
Fourteen states and the United States Eighth Circuit Court of Appeals were listed as supporting the rule of denying recovery. The author further stated at Annot., 64 A.L.R.2d 100, 143 (1959):
"A number of courts have held, and it is probably now the accepted rule in a majority of the jurisdictions where the question has been passed upon, that where definite and objective physical injury is produced as a result of emotional stress wrongfully caused by defendant, he may be held liable for such physical consequences notwithstanding the absence of any physical impact upon plaintiff at the time of the mental shock."
Twenty-four states and the United States Fifth Circuit Court of Appeals were listed as following the rule of allowing recovery. According to the Later Case Service of A.L.R.2d, there is only one state which has been added to the list of jurisdictions denying recovery. However, seven states have joined the ranks of those jurisdictions allowing recovery; four of these were among those previously denying recovery and thus necessitated the overruling of prior decisions. See 64-72 A.L.R.2d Later Case Service at 7-8 (1967) and at 6-7 (Supp. 1974).
Professor Prosser has stated that since 1890, "a considerable and rather rapidly increasing majority of the courts have repudiated the requirements of `impact,' and have regarded the physical consequences themselves, or the circumstances of the accident, as sufficient guarantee [that the mental disturbance is genuine]." W. Prosser, Handbook of the Law of Torts § 54, at 332 (4th ed. 1971). Prosser further adds: "At this writing [1971] twenty-seven states so hold, and all but four of them have taken the position since 1900." Id. at 332 n. 80. Professor Prosser concludes that it is "apparent that the impact rule is destined for rapid extinction, and might perhaps even never be applied again." Id. at 332.
It is recognized in a limited treatment of the subject in 38 Am.Jur.2d Fright, Shock and Mental Disturbance § 48, at 61 (1968), as follows:
"In many jurisdictions one whose negligence causes fright which results in illness or physical injury is liable therefor, even if there was no physical impact... ." [Citing cases from 19 states and eight A.L.R. annotations].
It is likewise stated in 25 C.J.S. Damages § 70, at 831-32 (1966), as follows:
"However, it is now the rule in a majority of jurisdictions, that a recovery may be had for the physical consequences of the shock, fright, or similar mental disturbance *331 proximately resulting from defendant's original wrongful act, on the ground that the fright occasioned by defendant's wrongful act is an intervening but not a controlling cause and that the physical consequences are the natural and proximate consequences of the original wrongful act." (Footnotes omitted).
In discussing the change in the law with respect to the requirement of a contemporaneous physical injury in order to be able to recover, Professor Prosser notes: "No general agreement has yet been reached as to liability for negligence resulting in fright, shock, or other `mental suffering,' or its physical consequences." W. Prosser, Handbook of the Law of Torts § 54, at 327 (4th ed. 1971). Professor Prosser informs us of the major objections against allowing recovery, as follows:
"[I]t is said that mental disturbance cannot be measured in terms of money, and so cannot serve in itself as a basis for the action; that its physical consequences are too remote, and so not `proximately caused;' that there is a lack of precedent, and that a vast increase in litigation would follow. All these objections have been demolished many times, and it is threshing old straw to deal with them. Mental suffering is no more difficult to estimate in financial terms, and no less a real injury than `physical' pain; it is not an independent intervening cause, but a thing brought about by the defendant's negligence itself, and its consequences follow in unbroken sequence from that negligence; and while it may be true that its consequences are seldom very serious unless there is some predisposing physical condition, the law is not for the protection of the physically sound alone. It is the business of the courts to make precedent where a wrong calls for redress, even if lawsuits must be multiplied, and by this time there is precedent enough, and no such increase in litigation is to be observed.
It is now more or less generally conceded that the only valid objection against recovery for mental injury is the danger of vexatious suits and fictitious claims, which has loomed very large in the opinions as an obstacle. The danger is a real one, and must be met. Mental disturbance is easily simulated, and courts which are plagued with fraudulent personal injury claims may well be unwilling to open the door to an even more dubious field. But the difficulty is not insuperable. Not only fright and shock, but other kinds of mental injury are marked by definite physical symptoms, which are capable of clear medical proof. It is entirely possible to allow recovery only upon satisfactory evidence and deny it when there is nothing to corroborate the claim, or to look for some guarantee of genuineness in the circumstances of the case. The problem is one of adequate proof, and it is not necessary to deny a remedy in all cases because some claims may be false. The very clear tendency of the recent cases is to refuse to admit incompetence to deal with such a problem, and to find some basis for redress in a proper case." (Footnotes omitted). Id. at 327-28.
Prosser also suggests:
"Undoubtedly the change in the law has led to recovery by the plaintiff in some cases in which it has not been medically justifiable, although these are almost certainly outweighed by the far greater number in which it is. It would seem that there must necessarily be, in lieu of impact, some requirement of satisfactory proof, and at least in the absence of knowledge of the plaintiff's unusual susceptibility, there should be no recovery for hypersensitive mental disturbance where a normal individual would not be affected under the circumstances. But in general, it seems clear that the courts which deny all remedy in *332 such cases are fighting a rearguard action." (Footnotes omitted). Id. at 332-33.
The Restatement (Second) of Torts § 313 (1965) recognizes the liability of a person who negligently subjects another to emotional distress likely to cause physical consequences. The section provides in part:
"(1) If the actor unintentionally causes emotional distress to another, he is subject to liability to the other for resulting illness or bodily harm if the actor
(a) should have realized that his conduct involved an unreasonable risk of causing the distress, otherwise than by knowledge of the harm or peril of a third person, and
(b) from facts known to him should have realized that the distress, if it were caused, might result in illness or bodily harm."
The comment following Section 313 emphasizes that:
"[O]ne who unintentionally but negligently subjects another to such an emotional distress does not take the risk of any exceptional physical sensitiveness to emotion which the other may have unless the circumstances known to the actor should apprise him of it. Thus, one who negligently drives an automobile through a city street in a manner likely merely to startle a pedestrian on a sidewalk, is not required to take into account the possibility that the latter may be so constituted that the slight mental disturbance will bring about an illness."
It is further provided in Restatement (Second) of Torts § 436 (1965), as follows:
"(1) If the actor's conduct is negligent as violating a duty of care designed to protect another from a fright or other emotional disturbance which the actor should recognize as involving an unreasonable risk of bodily harm, the fact that the harm results solely through the internal operation of the fright or other emotional disturbance does not protect the actor from liability.
(2) If the actor's conduct is negligent as creating an unreasonable risk of causing bodily harm to another otherwise than by subjecting him to fright, shock, or other similar and immediate emotional disturbance, the fact that such harm results solely from the internal operation of fright or other emotional disturbance does not protect the actor from liability.
(3) The rule stated in Subsection (2) applies where the bodily harm to the other results from his shock or fright at harm or peril to a member of his immediate family occurring in his presence."
Several jurisdictions have recently re-evaluated this impact rule; all but one of the states have chosen to abandon the impact rule which had been adopted in their earlier decisions.
In Battalla v. State, 10 N.Y.2d 237, 219 N.Y.S.2d 34, 176 N.E.2d 729 (1961), overruling Mitchell v. Rochester Ry., 151 N.Y. 107, 45 N.E. 354, 34 L.R.A. 781 (1896), "the infant plaintiff was placed in a chair lift [at a ski center] by an employee of the State who failed to secure and properly lock the belt intended to protect the occupant. As a result of this alleged negligent act, the infant plaintiff became frightened and hysterical upon the descent, with consequential injuries." 10 N.Y.2d at 239, 219 N.Y.S.2d at 35, 176 N.E.2d at 729. The high court overruled the Mitchell case which held "that there could be no recovery for injuries, physical or mental, incurred by fright negligently induced," and held that a cause of action had been stated. 10 N.Y.2d at 239, 219 N.Y.S.2d at 35, 176 N.E.2d at 730.
In Robb v. Pennsylvania R.R., 8 Storey 454, 58 Del. 454, 210 A.2d 709 (1965), the plaintiff was driving her automobile when *333 the rear wheels became lodged in a deep rut negligently permitted at the defendant's railroad crossing. After failing in attempts to move the vehicle, the plaintiff jumped from the stalled vehicle, narrowly avoiding a collision with an approaching train. The plaintiff was greatly frightened and emotionally disturbed, which resulted in physical injuries. The Court held:
"[W]here negligence proximately caused fright, in one within the immediate area of physical danger from that negligence, which in turn produced physical consequences such as would be elements of damage if a bodily injury had been suffered, the injured party is entitled to recover under an application of the prevailing principles of law as to negligence and proximate causation." 58 Del. at 464, 210 A.2d at 714-15.
In Falzone v. Busch, 45 N.J. 559, 214 A.2d 12 (1965), overruling Ward v. West Jersey & Seashore R.R., 65 N.J.L. 383, 47 A. 561 (1900), the plaintiff was sitting in her parked car when "the defendant's negligently-driven automobile `veered across the highway and headed in the direction of this plaintiff,' coming `so close to plaintiff as to put her in fear for her safety.' As a direct result, she became ill and required medical attention." 45 N.J. at 561, 214 A.2d at 13. The Supreme Court overruled Ward which had required a physical impact upon the plaintiff in order to sustain a negligence action. The Court said:
"We hold, therefore, that where negligence causes fright from a reasonable fear of immediate personal injury, which fright is adequately demonstrated to to have resulted in substantial bodily injury or sickness, the injured person may recover if such bodily injury or sickness would be regarded as proper elements of damage had they occurred as a consequence of direct physical injury rather than fright." 45 N.J. at 569, 214 A.2d at 17.
In Savard v. Cody Chevrolet, Inc., 126 Vt. 405, 234 A.2d 656 (1967), a truck driven by defendant's agent lost control and crashed into the plaintiff's house with a consequent loud noise, loss of light, and with a showering of light debris on the plaintiff. As a result, the plaintiff suffered nervous shock, emotional distress, sleeplessness, loss of appetite and loss of weight. The Court adopted what they called the "modern rule," and held:
"[W]here negligence causes fright from a reasonable fear of immediate personal injury, and such fright is adequately demonstrated to have resulted in substantial bodily injury or sickness, the injured person may recover if such injury or sickness would be proper elements of damage if they had resulted as a consequence of direct physical injury rather than fright." 126 Vt. at 410, 234 A.2d at 660.
In Niederman v. Brodsky, 436 Pa. 401, 261 A.2d 84 (1970), a motorist skidded onto a sidewalk and struck the plaintiff's son, who was standing next to him, causing the plaintiff to sustain a heart attack as a result of the fright and shock. The Court held:
"We today choose to abandon the requirement of a physical impact as a precondition to recovery for damages proximately caused by the tort in only those cases like the one before us where the plaintiff was in personal danger of physical impact because of the direction of a negligent force against him and where plaintiff actually did fear the physical impact." 436 Pa. at 413, 261 A.2d at 90.
In Daley v. LaCroix, 384 Mich. 4, 179 N.W.2d 390 (1970), overruling Nelson v. Crawford, 122 Mich. 466, 81 N.W. 335 (1899), the defendant's vehicle left the road upon which it was traveling and sheared off a utility pole. The high voltage wires leading to the plaintiff's house snapped, causing a great electrical explosion *334 resulting in considerable property damage. As a result of the explosion and attendant circumstances, the plaintiff suffered emotional disturbance manifesting itself in ways such as loss of weight and inability to perform ordinary household duties. The court overruled the Nelson case which denied recovery for negligently-caused emotional disturbance, absent a showing of physical impact. The Court said:
"We hold that where a definite and objective physical injury is produced as a result of emotional distress proximately caused by defendant's negligent conduct, the plaintiff in a properly pleaded and proved action may recover in damages for such physical consequences to himself notwithstanding the absence of any physical impact upon plaintiff at the time of the mental shock." 384 Mich. at 12-13, 179 N.W.2d at 395.
The only recent case refusing to repudiate the impact rule is Gilliam v. Stewart, 291 So.2d 593 (Fla. 1974). In that case two vehicles were involved in an intersectional collision, with one vehicle coming to rest on the plaintiff's property and the other vehicle striking and causing minor damage to the plaintiff's dwelling. The plaintiff suffered a heart attack as a result of the fright caused by the noise of the collision. In an excellently prepared opinion, the intermediate appellate court rejected the impact rule earlier adopted by the Florida Supreme Court. Stewart v. Gilliam, 271 So.2d 466 (Fla.App. 1973). However, in a 4-to-3 vote the Florida Supreme Court refused to abandon the impact rule, without going into any great discussion of its reasoning, although it did state:
"There may be circumstances under which one may recover for emotional or mental injuries, as when there has been a physical impact or when they are produced as a result of a deliberate and calculated act performed with the intention of producing such an injury by one knowing that such act would probably  and most likely  produce such an injury, but those are not the facts in this case." 291 So.2d at 595.
See Justice Adkins' detailed dissent in Gilliam v. Stewart, 291 So.2d 593, 596 (1974).
After reviewing the numerous cases on the subject, there is no doubt that it is not only the modern trend, but also the weight of the majority of jurisdictions, that a physical impact is not required in order to recover for genuine physical consequences of fright, shock, or other mental distress resulting from a negligent act. However, many of the cases seem to indicate that the "impact" rule will be ignored only in those cases where the fright, shock, or other mental distress results from a fear of immediate physical injury. Nonetheless, the legal writers have not seen fit to discuss in any significant detail the merits of such a distinction, if in fact it exists at all. See generally 2 F. Harper and F. James, The Law of Torts § 18.4, at 1031-39 (1956); W. Prosser, Handbook of the Law of Torts § 54, at 327-35 (1956); Bohlen, Right to Recover for Injury Resulting from Negligence Without Impact, 41 Am. L.Reg. 141 (1902); Goodrich, Emotional Disturbance as Legal Damage, 20 Mich.L. Rev. 497 (1922); Green, "Fright" Cases, 27 Ill.L.Rev. 761 (1933); Hallen, Damages for Physical Injuries Resulting from Fright or Shock, 19 Va.L.Rev. 253 (1933); Magruder, Mental and Emotional Disturbance in the Law of Torts, 49 Harv.L.Rev. 1033 (1936); Smith, Relation of Emotions to Injury and Disease: Legal Liability for Psychic Stimuli, 30 Va.L.Rev. 193 (1944); Throckmorton, Damages for Fright, 34 Harv.L.Rev. 260 (1920).
One case in particular which did not require a fear of immediate physical injury, but merely a fright or shock, is Great Atlantic & Pacific Tea Co. v. Roch, 160 Md. 189, 153 A. 22 (1931). In that case employees of the defendant grocery store carelessly and negligently sent a package containing a dead rat to the plaintiff instead of sending a loaf of bread as ordered. *335 Upon opening the package the plaintiff suffered shock to her nervous system which resulted in physical pain and mental anguish. The Court stated: "Under the decisions of this court damages may be recovered for physical injuries caused by fright or shock." 160 Md. at 191, 153 A. at 23. The Roch case was cited in a very recent case, Testerman v. H & R Block, Inc., 22 Md. App. 320, 324 A.2d 145 (1974), where the court stated that in order to avoid the impact rule the plaintiff must have suffered shock or mental anguish followed by physical injury which was the result of (1) an apprehension of impending danger, (2) an intentional wrong, or (3) an outrageous wrong.
In Mississippi the Supreme Court has had the opportunity to decide several cases relating to the legal principles applicable in the instant case which will assist in an analysis of this area of law.
In two early cases, Gulf & S.I.R.R. v. Beard, 129 Miss. 827, 93 So. 357 (1922), and Mobile & O.R.R. v. Flannagan, 141 Miss. 7, 105 So. 749 (1925), this Court restated the rule that there can be no recovery for actual damages for annoyance, worry, or mental anguish disconnected from physical suffering.
The Court then began carving what appears to be an exception to the "physical suffering" rule in Mississippi Power Co. v. Byrd, 160 Miss. 71, 133 So. 193 (1931). In that case the defendant power company negligently cut off the electric current to the plaintiff's home for two days. As a result, the plaintiff claimed that he suffered "mental pain," although there is no mention of any accompanying or subsequent physical injury. The Court stated:
"The evidence in this case fails to show that appellee suffered any physical injury on account of being deprived of electric lights for two days. Damages for mental suffering cannot be recovered where caused by simple negligence, where there is no bodily injury, malice, insult or fraud." 160 Miss. at 77, 133 So. at 194.
In the case of Continental Casualty Co. v. Garrett, 173 Miss. 676, 161 So. 753 (1935), the Court allowed actual and punitive damages for physical injuries resulting from emotions being aroused in a sick man. However, the act complained of was willful and wanton and was also accompanied by a trespass. (Parasitic damages).
In 1937, this Court considered a case containing what appears to be the identical issue as presented in the instant case. In Doherty v. Mississippi Power Co., 178 Miss. 204, 173 So. 287 (1937), the plaintiff had informed the defendant power company that she was pregnant, had been ill for some months, and was in a highly nervous condition. To avoid being disturbed, she requested the power company to credit her bill with the accrued interest on her deposit. The power company refused and disconnected the electric service for one day. As a result, the plaintiff suffered mental worry and humiliation which caused her to become highly nervous so as to threaten a miscarriage and result in illness and physical pain. The Court stated:
"We are of the opinion that the evidence establishes mere negligence, and does not tend to prove that the acts of the appellee were characterized by malice, fraud, oppression, willful wrong, or gross negligence; and this being true, punitive damages were not recoverable." 178 Miss. at 213-14, 173 So. at 289.
The Court further stated:
"There was testimony tending to show that as a result of the controversy, and the disconnecting of appellant's lights, she was caused to suffer mental worry and emotional disturbance, which subsequently caused her to suffer illness and physical pain, for all of which, it is contended, she is entitled to recover actual damages. It is the established rule in this State that there can be no recovery *336 for mental pain and suffering, disconnected from physical injury and suffering. Western Union Telegraph Co. v. Rogers, 68 Miss. 748, 9 So. 823, 13 L.R.A. 859, 24 Am.St.Rep. 300; Western Union Telegraph Co. v. Koonce, 112 Miss. 173, 72 So. 893; Grenada Bank v. Lester, 126 Miss. 442, 89 So. 2; Gulf & Ship Island R.R. Co. v. Beard, 129 Miss. 827, 93 So. 357. But the narrow question here presented is whether or not, where there is no physical injury or pain immediately resulting from the negligent act, there can be recovery for mental worry and emotional distress, and subsequent physical injury and suffering resulting solely from the mental distress. There is authority for the view that under some circumstances such damages are recoverable." 178 Miss. at 214-15, 173 So. at 289-90.
The Court then quoted Restatement of Torts § 306, relating to negligent acts creating an unreasonable risk of bodily harm to another, and Restatement of Torts § 312, relating to intentional and unreasonable infliction of emotional distress. The Court then held:
"Without expressing an opinion as to the correctness of the doctrine announced in the two above-quoted sections of the Restatement of the Law, when applied in the light of former decisions in this court, we are of the opinion that the evidence in this case does not bring the acts of appellee in disconnecting appellant's lights within the doctrine of either of the quoted sections. It is true that appellant testified that she informed appellee's agent that she was sick and had been under the treatment of a physician, and expected to have to call a physician at any time; but that alone would not furnish a basis for the inference that, by the mere act of disconnecting the electric service, appellant's agents intended to subject, or should have realized that the act involved any unreasonable risk of subjecting, appellee to such emotional disturbance as would likely result in illness or other bodily harm. We think that under the evidence in this record, no damages were recoverable for mental suffering or subsequent physical injury and pain resulting therefrom." 178 Miss. at 215-16, 173 So. at 290.
However, at least nominal damages were allowed for the power company's breach of duty to allow the plaintiff to offset the interest due her against her electric bill.
If the Mississippi Supreme Court had recognized the doctrine allowing recovery where there is no impact, but where there is subsequent physical injury resulting from mental distress of something other than either a fear of bodily harm or of a willful or wanton act, then the plaintiff in the Doherty case in all probability would have been successful. Yet, in the Doherty case, the Court was very careful not to express an opinion as to whether the two Restatement of Torts doctrines would be followed. It could also be considered that the court was not attempting to preclude recovery under any other doctrines either. The Court merely stated that the facts of the Doherty case did not fit under either of the two discussed doctrines.
The Court then re-established the doctrine first hinted in Mississippi Power Co. v. Byrd, supra, that recovery may be had for mental distress in the absence of any physical injury where the mental distress was caused by a willful or wanton act. In Saenger Theatres Corp. v. Herndon, 180 Miss. 791, 178 So. 86 (1938), a fourteen-year-old girl had been reported to a movie theater manager because she was annoying the audience by giggling and running in the aisle. On a subsequent day, the girl was refused admittance to the movie theater by a ticket taker and was told:
"`That she could not attend the show and that he would not permit her to enter; that she had been guilty of such indecent conduct as rendered her unfit and an improper character to enter the show; that she had been guilty of indecent and *337 low-down conduct in the show.' This language is averred to have been uttered in the hearing of divers persons then present; and it is shown by the evidence that the effect of it was to send the girl away crying and to produce such shame and humiliation that she went to bed and had to receive home treatment of sedatives to relieve the shock and mental suffering." 180 Miss. at 798, 178 So. at 87.
In the opinion of the Supreme Court, Judge Griffith states:
"The court was, therefore, not in error in admitting evidence of mental pain and suffering, although unaccompanied by a distinct physical injury. Ordinarily, it is true, damages for mental pain and suffering not accompanied by a distinct physical injury are not allowable; but this rule does not include cases of wanton or shamefully gross wrong, such as the case now before us." 180 Miss. at 799, 178 So. at 87.
In Arnold v. Spears, 217 Miss. 209, 63 So.2d 850 (1953), the Court held:
"[W]hile recovery cannot be had for mental pain and anguish unconnected with physical injury, in an action arising out of the negligent breach of a contract whereby simple negligence is involved, such rule does not apply to cases founded purely in tort, where the wrongful act is such as reasonably to imply malice, or where, from entire want of care or attention to duty or great indifference to the persons, property, or rights of others, such malice will be imputed as would justify assessment of exemplary or punitive damages." 217 Miss. at 217-18, 63 So.2d at 854 (original emphasis). [adopting the Florida view from Kirksey v. Jernigan, 45 So.2d 188, 17 A.L.R.2d 766 (Fla. 1950)].
In Lyons v. Zale Jewelry Co., 246 Miss. 139, 150 So.2d 154 (1963), an employee for the defendant store contacted the plaintiff about collecting a debt claimed to be owed by the plaintiff's son. The employee used vile and abusive language and made threats to the plaintiff which caused extreme shock and mental anguish resulting in physical pain. The trial court sustained a demurrer to the plaintiff's cause of action, but the Supreme Court reversed, with Judge Kyle stating:
"In general, damages for mental anguish or suffering are recoverable when they are the natural or proximate result of an act committed maliciously, intentionally, or with such gross carelessness or recklessness as to show an utter indifference to the consequences when they must have been in the actor's mind. In most jurisdictions in fact, damages are recoverable for mental anguish and suffering caused by a willful, wanton, malicious, or intentional wrong, even though no bodily injury is sustained or other pecuniary damage alleged or proved." 246 Miss. at 149-50, 150 So.2d at 158.
Judge Kyle further added:
"In the extended annotation on Torts, Emotional Disturbances, which appears in 64 A.L.R.2d 100, 143, the textwriter says: `A number of courts have held, and it is probably now the accepted rule in a majority of the jurisdictions where the question has been passed upon, that where definite and objective physical injury is produced as a result of emotional stress wrongfully caused by defendant, he may be held liable for such physical consequences notwithstanding the absence of any physical impact upon the plaintiff at the time of the mental shock." 246 Miss. at 152, 150 So.2d at 159. (Emphasis added).
In the case of Daniels v. Adkins Protective Service, Inc., 247 So.2d 710 (Miss. 1971), an employee of the defendant funeral home had negligently embalmed the plaintiff's deceased husband, which resulted in the condition of gas gangrene in the body and, thus, prevented the body from being viewed by the plaintiff. As a result, *338 the plaintiff became very much upset and suffered a mental breakdown requiring psychiatric treatment and hospitalization. The opinion does not indicate whether there was suffered any subsequent physical injury. Judge Inzer stated for the Court:
"The rule in this State is that there can be no recovery for mental pain and suffering from the mere negligent act of another unaccompanied by physical or bodily injury. However, damages are recoverable for mental pain and anguish by a willful, wanton, malicious or intentional wrong even though no bodily injury was sustained. [Citing cases].
Since appellant suffered no bodily injury or trauma, the burden was upon her to prove that the improper embalming of her husband's body was done maliciously, intentionally, or with such gross negligence or recklessness to show an utter indifference to the consequence." 247 So.2d at 711.
In T.G. Blackwell Chevrolet Co. v. Eshee, 261 So.2d 481 (Miss. 1972), the plaintiff became sick and was injured physically by defendant's threat to injure his credit rating when the plaintiff refused to make payments pursuant to a contract containing the plaintiff's signature, which was forged by the defendant's agent. The Court affirmed the judgment allowing recovery "for emotional anguish, suffering, and emotional distress where the wrongful act causing such condition was intentionally or willfully done or done with such grossness and recklessness as to evince utter indifference to consequences." 261 So.2d at 485. Although this was a case of fraud, this Court stated:
"There is a modern trend of court opinions moving toward permitting the recovery for mental pain or emotional damages as an independent ground of recovery, in cases of intentional or willful wrong or acts done with such gross carelessness or recklessness as to indicate utter disregard for the rights of others." 261 So.2d at 485.
A recent Federal court decision has briefly discussed Mississippi's law in Johnson v. Ford Motor Co., 354 F. Supp. 645 (N.D.Miss. 1973). In that case, the plaintiff's son was injured because of a defective automobile manufactured by Ford which resulted in an accident. Because of the son's injuries, the plaintiff endured severe mental anguish, worry and apprehension. The opinion is void of any remarks with respect to subsequent physical injuries. Judge Smith stated in his opinion:
"The Mississippi Supreme Court, on many occasions, has considered the award of damages for mental pain and suffering not accompanied by distinct physical injury, and has adopted the rule that such are allowable when occasioned by a wilful, wanton, intentional or malicious wrong. See Saenger Theatres Corp. v. Herndon, (1938) 180 Miss. 791, 178 So. 86...; Daniels v. Adkins Protective Service, Inc., (Miss. 1971), 247 So.2d 710 ...; Lyons v. Zale Jewelry Co., (1963) 246 Miss. 139, 150 So.2d 154...; T.G. Blackwell Chevrolet Co. v. Eshee (1972) Miss., 261 So.2d 481 ...; Doherty v. Mississippi Power Co. (1937) 178 Miss. 204, 173 So. 287... ." 354 F. Supp. at 648.
It seems to be certain that in Mississippi a plaintiff may recover damages for emotional distress due to willful or wanton acts in the absence of a simultaneous accompanying physical injury (impact). Furthermore, Saenger Theatres Corp. v. Herndon, supra, seems to indicate that recovery for emotional distress due to willful or wanton acts will be allowed in the absence of any physicial injuries, whether simultaneously accompanying the act or subsequently occurring.
The legal research writers have pointed out that the only reason for the impact doctrine and for the denial of recovery is the inability of the courts to guarantee that an injury actually occurred. It seems to *339 us, however, that there is no greater burden on a claimant to establish facts showing negligence and injury without trauma than in cases where slight physical contact caused great mental anguish and physical pain.
The argument that the abolishment of the impact doctrine will generate excessive litigation has proven to be incorrect in jurisdictions where the doctrine has been abandoned heretofore.
After much study, we have reached the conclusion that there is no valid reason why this Court should continue to follow an out-moded doctrine which prevents persons who have a genuine legitimate claim for damages growing out of a negligently-caused injury from recovery simply because the negligent person did not touch the injured claimant.
We, therefore, abandon the "impact doctrine" heretofore followed by this Court, so that hereafter genuine cases of injury growing out of the negligent acts of another  which are reasonably foreseeable as in other negligent cases  will not be dismissed simply because there was no trauma nor impact on the body of the injured claimant.
We are of the opinion that the facts in the instant case established a genuine claim which was subject to the determination of the jury and that the judgment of the trial court based on the verdict of the jury should be affirmed.
The majority of this Court is of the opinion that the facts in this case do not reach the required standard to establish the right to recover punitive damages. In Fowler Butane Gas Co. v. Varner, 244 Miss. 130, 141 So.2d 226 (1962), we said:
"The kind of wrongs to which punitive damages are applicable are those which, besides the violation of a right or the actual damages sustained, import insult, fraud or oppression and not merely injuries but injuries inflicted in the spirit of wanton disregard for the rights of others. In order to warrant the recovery of punitive damages, there must enter into the injury some element of aggression or some coloring of insult, malice or gross negligence, evincing ruthless disregard for the rights of others, so as to take the case out of the ordinary rule." 244 Miss. at 150-51, 141 So.2d at 233.
We hold, therefore, that the judgment of the trial court should be and is hereby affirmed on direct and cross-appeals. This case was considered by a conference of judges en banc.
Affirmed.
GILLESPIE, C.J., and INZER, SMITH and ROBERTSON, JJ., concur.
PATTERSON, SUGG, WALKER and BROOM, JJ., dissent in part.
PATTERSON, Justice (dissenting):
I concur in that which is stated by Justice Sugg in his dissent, but in view of the novel facts, state the following by way of further dissent.
Under the present situation these questions arise: What more could Langley reasonably have done to remove the suspicion of embezzlement overshadowing him than to repeatedly request the bank to check its depository mechanism. How could the bank have done less in its investigation of the depository which was totally under its control?
The prestige of the bank is unquestioned. The stoutly maintained infallibility of its depository enhanced the innuendo of embezzlement by Langley. Only a sincere investigation by the bank could remove this unlawful shadow. The final investigation of the depository revealing the missing funds was motivated, not by the bank, but rather by the auditors of Langley's company *340 who apparently understood the situation of the parties.
In my opinion this created an issue for a jury to resolve, i.e., whether the bank was merely negligent or was grossly negligent in its disregard for the rights of Langley.
SUGG, WALKER and BROOM, JJ., join in this dissent.
SUGG, Justice (dissenting):
I concur with that part of the majority opinion which permits recovery for injuries where there is no physical contact, thus abolishing the impact doctrine. I dissent from that part of the majority opinion holding that the evidence in support of Langley's claim for punitive damages was not sufficient to permit the jury to consider the question of punitive damages.
I recognize that, since punitive damages are assessed as an example and warning to others, they are not favored in law and are to be allowed only with caution and within narrow limits. In Snowden v. Osborne, 269 So.2d 858 (Miss. 1972), this Court stated the reason for allowing punitive damages in the following language:
... Exemplary or punitive damages are those, of course, which are in addition to the actual or compensatory settlement. They are granted in the nature of punishment for the wrongdoing of the defendant and as an example so that others may be deterred from the commission of similar offenses thereby in theory protecting the public. Yazoo & Mississippi Valley R.R. Co. v. May, 104 Miss. 422, 61 So. 449 (1913); Yazoo & Mississippi Valley R.R. Co. v. Hardie, 100 Miss. 132, 55 So. 42 (1911). See also United States Fidelity & Guaranty Co. v. State, 254 Miss. 812, 182 So.2d 919 (1966); Fowler Butane Gas Co. v. Varner, 244 Miss. 130, 141 So.2d 226 (1962); West Bros., Inc. v. Barefield, 239 Miss. 530, 124 So.2d 474 (1960); as well as the discussion in 15 Am.Jur., Damages, § 265, p. 698 (1938).
The basis in awarding such damages to the injured party is that of rewarding an individual for public service in bringing the wrongdoer to account. Fowler Butane Gas Co. v. Varner, supra; Neal v. Newburger Co., 154 Miss. 691, 123 So. 861 (1929); and Hines v. Imperial Naval Stores Co., 101 Miss. 802, 58 So. 650 (1911). 269 So.2d at 860.
In Seals v. St. Regis Paper Co., 236 So.2d 388 (Miss. 1970), although the Court did not allow punitive damages under the facts in that case, the Court stated:
... Punitive damages may be recovered for a willful and intentional wrong, or for such gross negligence and reckless negligence as is equivalent to such a wrong... . (Emphasis supplied.) 236 So.2d at 392.
The majority opinion quotes Fowler Butane Gas Co. v. Varner, 244 Miss. 130, 141 So.2d 226 (1962), in which the Court held the following:
... In order to warrant the recovery of punitive damages, there must enter into the injury some element of aggression or some coloring of insult, malice or gross negligence, evincing ruthless disregard for the rights of others, so as to take the case out of the ordinary rule... . (Emphasis supplied.) 244 Miss. at 150-51, 141 So.2d at 233.
The evidence shows that the bank was guilty of gross negligence and evinced a ruthless disregard for the rights of Langley to such an extent that the question of punitive damages should have been submitted to the jury. Langley was manager of a store for A & P and made two deposits for his employer on July 22, 1972. On July 31, 1972, the New Orleans office of A & P notified Langley that it had not received both duplicate deposit slips. The slip covering a deposit in the amount of $2,392.50 was missing.
*341 Langley immediately notified the bank through the teller who checked the records of the bank and stated that there was no record of the deposit. Langley insisted that the deposit was made and suggested that the bag containing the missing deposit might be lodged in the night depository. He requested that the night depository be searched for the missing deposit. A cursory examination was made by employees of the bank, but the missing deposit was not discovered. Langley repeatedly called the bank once or twice daily inquiring about the deposit and on August 4, 1972, the Vice-President and Manager of the Woodland Hills Branch came to the store managed by Langley to explain the procedures of receiving night deposits. Langley again insisted that the deposit was in the deposit box somewhere, but the branch manager stated that he knew of no way a deposit could have been hung up in the box, but suggested the possibility that the deposit didn't go all the way through, and when the lid was opened later, the deposit might have been removed by another person.
On August 24, 1972, one of the auditors of A & P in New Orleans called the bank's auditor in Jackson in an attempt to locate the missing deposit. On the same day the bank again inspected the night depository and, after a close examination, saw fabric inside the night depository. The bank called the manufacturer of the night depository who sent a representative who disassembled the mechanism and found the missing deposit within twenty minutes trapped between the flipper plate and the back plate of the hopper.
It was noted in the majority opinion that, after the deposit was found, one of the witnesses then surmised that, when a drawstring bag is used, it is "very easy for either the ball on the end of the string, or the string itself to become snared at the edge of the flipper plate and hang, and when the flipper plate comes back to his home position, it will draw it right behind the flipper plate."
When the bank finally made a genuine effort to ascertain whether or not the deposit was trapped in the depository, it took only twenty minutes to disassemble the mechanism and locate the missing deposit.
The bank chose to substitute a mechanical device for an employee to receive deposits. If the bank had used an employee to accept deposits, such person would have issued a receipt at the time of the deposit and the unfortunate events of this case would not have occurred.
The bank was grossly negligent and evinced a ruthless disregard of Langley's rights when, after repeated requests by Langley, it made only cursory examinations of the night deposit mechanism to ascertain the truth of his story. Under these facts, the issue of punitive damages should have been submitted to a jury. An award of punitive damages by a jury would be justified under the facts of this case and would serve as an example to all others using mechanical devices to accept deposits to act on similar complaints in a realistic manner by immediately disassembling such mechanisms. Such procedure would rule out the possibility that deposits might have been retained within the mechanism.
It is without question that the cloud of suspicion hanging over Langley that he might have embezzled the missing deposit seriously affected his health. He suffered an emotional upset to the extent that it was evident in his physical appearance. In addition, his position with his employer, which had been achieved after years of effort, was almost destroyed, resulting in his demotion to a lesser position with a decreased salary. The issue of punitive damages should have been submitted to the jury.
PATTERSON, WALKER and BROOM, JJ., join in this dissent.